[Crim. No. 20657. July 25, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
WINFRED SADDLER, Defendant and Appellant.

## COUNSEL

Quin Denvir and Paul Halvonik, State Public Defenders, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Harold E. Shabo and H. Elizabeth Harris, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Michael D. Wellington and Jesus Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MANUEL, J.—Defendant Winfred Saddler appeals from a judgment entered on a jury verdict finding him guilty of robbery in the first degree (Pen. Code, § 211).[1] He contends that the trial court committed prejudicial error in instructing the jury that it could draw adverse inferences from his failure to explain or deny evidence against him. We hold that the instruction complained of (CALJIC No. 2.62) suffers no constitutional or other infirmity, but was improperly given for lack of evidentiary support. We conclude that the error was not prejudicial.

Since the instruction at issue provides that adverse inferences can be drawn if a defendant fails to explain or deny evidence or facts against him which he can reasonably be expected to explain or deny, we set out the prosecution's case against him in detail: Constance Overfield, night desk clerk at Howard Johnson's Motor Lodge in Barstow, testified that approximately 1 a.m. on December 23, 1976, she noticed a light colored compact car come into the parking lot; immediately thereafter she opened the locked door of the motel to a young man who approached the desk, stated that his wife was a guest, and asked for her room number. He gave the name "Saddler." When Mrs. Overfield indicated that she could find no guest by that name, the man suggested that his wife could be with somebody else or was registered under her maiden name. The man was at first unable to recall the maiden name, then stated it was "Brown." Mrs. Overfield described the man as black and wearing a stocking (knit) cap, drab or tan jacket, and a sweater that was stretched at the neck.

After their conversation, the young man commenced to smoke a cigarette, and Mrs. Overfield turned away; when she next looked at the man, he was holding a knife and pointing it over the desk at her. He asked for money from the register and came around the desk to stand beside her. He again demanded the money from the register and then put his cigarette out on the floor in order to take the money she gave him. After forcing Mrs. Overfield to lie on the floor and threatening her, the assailant left, telling the woman not to scream or call the police or he would "get" her.

Mrs. Overfield called the police; Officers Jones and Sanders arrived promptly and she related the details of the incident to them. She identified defendant at the trial as her assailant.

---

[1]The trial followed two mistrials, one for jury misconduct and the second due to a hung jury.

Officer Jones testified that the robbery call was received at 1:20 a.m. and that he and two other officers responded and spoke with the victim for five to eight minutes; the victim stated that the robbery occurred about 1:15 and described her assailant as a black male, 5 feet, 10 inches, 140 pounds, and 25 years old. She also gave them the names "Brown" and "Saddler," both names familiar to the officers. Jones related that the only physical evidence found at the scene was the remains of a Kool cigarette which Mrs. Overfield picked up and handed to him. Jones did not know what happened to the cigarette butt, stating that it was "probably placed in an ashtray."

Detective Sessions testified that shortly after the robbery he brought a book of 60 mug shots to Mrs. Overfield; she selected none as that of her assailant. Later that same morning she was shown two more photographs and did not select either of them. Defendant's picture was not among those sets of pictures. About two weeks later she identified defendant from a six-photograph lineup. Defendant was arrested the following day and, after *Miranda* warnings, told Sessions he had been drinking heavily during the Christmas holidays and was not sure of his activities on the night in question; thereafter, however, he unequivocally denied involvement in the robbery. Sessions also testified that he clocked the time it took to go from the motel to defendant's nearby residence, nine minutes with brisk walking and three to four minutes by car.

Defendant presented an alibi defense. He testified that on the night in question he was at a local park drinking with a friend until after midnight. They walked together to defendant's house, arriving about 12:30 a.m. Defendant went to the kitchen and got something to eat. In accord with a habit of reading in the bathroom, defendant then went to the bathroom where he remained for about 30 minutes. During that time Officer Sanders, whom defendant knew and whose voice he recognized, came to the house, asked for defendant, and spoke with him momentarily through the closed bathroom door.

Defendant also testified that he never owned or wore clothes matching the description given by Mrs. Overfield, that he owned a switchblade knife but did not think he was carrying it on December 22-23,[2] and that he knew several persons who had small white compact cars, listing two persons. Defendant admitted to being "high" and "feeling good" on the evening in question, but denied that he told Detective Sessions that he

[2]A knife taken from defendant at the time of arrest was excluded from evidence for lack of showing that it resembled the knife used in the robbery.

was not sure of his activities on that night. Defendant testified that he was 18 years old in December 1976, weighed 165 pounds, and was 5 feet, 11 inches tall. He regularly smokes Salem cigarettes, habitually "bums" cigarettes, and sometimes smokes Kools, but does not "request" Kools from other persons.[3]

Defendant's mother and sister testified to substantially the same sequence of events after defendant's arrival at home, although the sister estimated that Officer Sanders arrived at 12:45 a.m.

Officer Sanders testified for the defense that he and Officer Jones arrived at the motel at 1:26 a.m. and, when Mrs. Overfield mentioned that her assailant had given the name "Saddler," he immediately went to the home of defendant, whom he knew, to see if he was there. It took him four minutes to drive to the Saddler residence. In the immediate vicinity of the house was a white Buick compact car. Sanders touched the hood and radiator area to find if it had been recently driven. The car was cold to the touch. The officer entered the house and, as testified by the occupants, called for Saddler and conversed momentarily with a male in the back of the house who stated he was in the bathroom. The officer then left.

The jury was instructed as to credibility of witnesses in general (CALJIC Nos. 2.20 and 2.21) and, over defense counsel's objection, was instructed as to the testimony of defendant in particular as follows: "If you find that he failed to explain or deny any evidence or facts against him which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable."[4]

---

[3]In contradiction of this testimony Detective Sessions testified in rebuttal that he had on prior occasions provided defendant with Kools at defendant's specific request.

[4]The full text of the instruction (CALJIC No. 2.62) read: "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus the decision as to whether he should testify is left to the defendant, acting with the advice and assistance of his attorney. In this case defendant has elected to and has testified as to certain facts. If you find that he failed to explain or deny any evidence or facts against him which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable. In this connection, however, it should be noted that if a defendant does not have the knowledge that he would need to deny or to explain evidence against him, it would be unreasonable to draw

Defendant contends that giving the above instruction (1) violated his privilege against self-incrimination; (2) denied him the presumption of innocence; (3) denied him due process in failing to give notice; (4) unfairly singled out his testimony; and (5) was unsupported by the evidence.

Comment on a criminal defendant's failure to testify was held violative of the Fifth Amendment privilege against self-incrimination in *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. California constitutional (former art. I, § 13) and statutory (former Pen. Code, § 1093, subd. 6) provisions at that time authorized comment on a defendant's failure to explain or deny evidence against him "whether the defendant testifies or not."[5] Section 13 of article I was repealed in 1974 and its text restated in article I, section 15, with no reference to comment on a defendant's testimony. In 1976, subdivision 6 of section 1093 was amended to delete the provision quoted above.

■ Defendant argues that the changes in these provisions indicate legislative disapproval of comment on a defendant's testimony when he takes the stand on his behalf as well as when he does not and invalidates CALJIC No. 2.62. We disagree. If the Legislature so intended, it would have modified other statutes which permit comment on a testifying defendant's failure to explain or deny. The Legislature did not modify Penal Code section 1127 which permits comment in instructions to the jury. Nor has the Legislature amended or repealed Evidence Code section 413 which permits the drawing of inferences against a party from the party's failure to explain or deny evidence.[6]

---

an inference unfavorable to him because of his failure to deny or explain such evidence. The failure of a defendant to deny or explain evidence against him does not create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt."

The instruction has been revised in the 1979 (fourth) edition of CALJIC in respects not here material.

[5]Article I, section 13 provided in pertinent part: "[I]n any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury."

Penal Code section 1093, subdivision 6 provided in pertinent part: "The judge . . . may comment on the failure of the defendant to explain or deny by his testimony any evidence or facts in the case against him, whether the defendant testifies or not . . . ."

[6]Section 413 provides: "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case."

Subsequent to the noted constitutional and statutory changes, we held that an instruction substantially similar to CALJIC No. 2.62 did not violate the defendant's privilege against self-incrimination. (*People* v. *Mayberry* (1975) 15 Cal.3d 143 [125 Cal.Rptr. 745, 542 P.2d 1337].) We reiterated the well settled rule that a defendant who takes the stand and testifies in his behalf waives his Fifth Amendment privilege (*Johnson* v. *United States* (1943) 318 U.S. 189 [87 L.Ed. 704, 63 S.Ct. 549]) and his state constitutional privilege to the extent of the scope of relevant cross-examination. (*Mayberry, supra,* 15 Cal.3d at p. 160; see also *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *Schader* (1969) 71 Cal.2d 761, 770-771 [80 Cal.Rptr. 1, 457 P.2d 841]; *People* v. *Ing* (1967) 65 Cal.2d 603, 611 [55 Cal.Rptr. 902, 422 P.2d 590]; *People* v. *Perez* (1967) 65 Cal.2d 615, 622 [55 Cal.Rptr. 909, 422 P.2d 597].)

■ Although the permissible scope of cross-examination in California is restricted to the scope of the direct examination (Evid. Code, §§ 772, subd. (d), 761; Witkin, Cal. Evidence (2d ed. 1966) § 1204), when a defendant "takes the stand and makes a general denial of the crime with which he is charged the permissible scope of cross-examination is very wide." (*People* v. *Zerillo* (1950) 36 Cal.2d 222, 228 [223 P.2d 223]; see *People* v. *James* (1976) 56 Cal.App.3d 876, 888 [128 Cal.Rptr. 733] [defendant testified to an alibi defense]; contrast *People* v. *Tealer* (1975) 48 Cal.App.3d 598, 606 [122 Cal.Rptr. 144] [defendant limited testimony to denial of an alleged admission.].)

In the instant case, defendant presented an alibi defense, undertaking to explain fully his activities during the period of the crime. He thereby waived his privilege against self-incrimination to the extent of the scope of cross-examination, and he makes no claim that there was evidence beyond the scope of relevant cross-examination that he failed to deny or explain which would have rendered the challenged instruction violative of *Griffin* and the Fifth Amendment.

■ It is claimed that the instruction denies to a defendant the presumption of innocence and places in its stead an "inference of guilt." ■ Since principles of due process protect the accused against conviction except upon proof beyond a reasonable doubt (*In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]), an instruction to the

jury which has the effect of reversing or lightening the burden of proof constitutes an infringement on the defendant's constitutional right to due process. (*People* v. *Serrato* (1973) 9 Cal.3d 753, 766-767 [109 Cal.Rptr. 65, 512 P.2d 289]; *People* v. *Hardy* (1948) 33 Cal.2d 52, 66 [198 P.2d 865]; *Smith* v. *Smith* (5th Cir. 1971) 454 F.2d 572, 578.) ▪ CALJIC No. 2.62 does not violate these principles. After stating the circumstances under which adverse inferences may be drawn, the instruction cautions that "The failure of a defendant to deny or explain evidence against him does not create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of defendant beyond a reasonable doubt."

Speaking to the comment rule previously contained in article I, section 13, this court stated in *People* v. *Modesto* (1965) 62 Cal.2d 436, 449-450 [42 Cal.Rptr. 417, 398 P.2d 753]: "The comment rule does not relieve the prosecution of its burden of proving every essential element of the crime and the defendant's guilt beyond a reasonable doubt. No presumption of guilt or of the truth of any fact arises. No inference can be drawn if defendant does not have the knowledge necessary to explain or deny the evidence against him. (*People* v. *Adamson,* 27 Cal.2d 478, 489-490 [165 P.2d 3]; *Adamson* v. *California,* 332 U.S. 46, 55-56 [91 L.Ed. 1903, 1910-1911, 67 S.Ct. 1672, 171 A.L.R. 1223].)" Despite subsequent limitations placed upon the comment rule by *Griffin* in 1965 and by this court in 1967 (*People* v. *Modesto* (1967) 66 Cal.2d 695, 709-712 [59 Cal.Rptr. 124, 427 P.2d 788]), the quoted language of the first *Modesto* decision has continued validity insofar as due process is concerned.

Defendant also suggests that principles of fairness require that he and the jury be given notice of the precise evidentiary facts upon which the inference of guilt shall be drawn and that he was denied due process in that he and the jury were not so informed. Under the instruction, however, inferences are permissible only *if the jury* finds that defendant failed to explain or deny facts or evidence that he could be reasonably expected to explain or deny. Implementation of defendant's suggestion would constitute an obvious invasion of the jury's province as the finder of fact and would impermissibly restrict defendant's right to trial by jury.

Defendant also argues that the challenged instruction should never be given because it impermissibly singles out a defendant's testimony and unduly focuses upon it. The same argument was rejected in *People* v. *Mayberry, supra,* 15 Cal.3d 143, 161. We noted there that the instruction

was consistent with Evidence Code section 413 which permits the drawing of inferences from any party's failure to explain or deny evidence against him. Since the only testifying "party" in a criminal case is the defendant, the code section can have reference only to him.[7]

■ Having determined that CALJIC No. 2.62 suffers no constitutional or other infirmity and may be given in an appropriate case, we reach the question whether it was proper to give it in this case. ■ The trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence (*People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370]; *People* v. *Graham* (1969) 71 Cal.2d 303, 318 [78 Cal.Rptr. 217, 455 P.2d 153]) and has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." (*People* v. *Satchell* (1971) 6 Cal.3d 28, 33, fn. 10 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383].) ■ "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference (*People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281])." (*People* v. *Hannon* (1977) 19 Cal.3d 588, 597 [138 Cal.Rptr. 885, 564 P.2d 1203].)

Giving of the instruction was upheld in *People* v. *Ing, supra,* 65 Cal.2d 603, where the defendant took the stand and denied committing three charged rapes but failed to mention or refer to uncharged offenses which the court had determined were relevant to show common scheme or plan. In *People* v. *Perez, supra,* 65 Cal.2d 615, unexplained offenses (two charged robberies and an uncharged robbery) were held within the scope of proper cross-examination and the instruction appropriate when the defendant testified and presented an alibi as to only two of the four charged robberies. In *People* v. *Thornton, supra,* 11 Cal.3d 738, the instruction was again held to be properly given when the defendant testified and denied committing one charge of rape but did not testify concerning the two uncharged sexual assaults which had been admitted as relevant to the issue of identity.

---

[7]We find inapposite the authorities cited by defendant dealing with the court's refusal to give instructions requested by defendant that related particular facts to legal issues presented or charged the jury how certain testimony of a witness should be considered. (See *People* v. *Lyons* (1958) 50 Cal.2d 245 [424 P.2d 556]; *People* v. *Smith* (1977) 67 Cal.App.3d 45 [136 Cal.Rptr. 387]; *People* v. *Young* (1948) 88 Cal.App.2d 129 [198 P.2d 384].)

In *People* v. *Tealer, supra,* 48 Cal.App.3d 598, the unexplained evidence fell outside the scope of permissible cross-examination. There, a defendant charged with attempted robbery took the stand and limited his testimony to a denial of having made a statement or admission. The jury was instructed in accord with CALJIC No. 2.62, and the prosecutor also commented on Tealer's failure to "explain away certain things when he took the stand" and his failure to "deny the facts of the case." The reviewing court reversed the judgment of conviction, reasoning that Tealer's denial of making the admission, unlike an attack on the voluntariness of an admission, did not place the truth of the admission into issue; thus, questioning about the general facts of the case would not have been within the proper scope of cross-examination and Tealer's failure to deny or explain the general facts should not have been referred to in the court's instructions. (*Tealer, supra,* at pp. 605-606.)

■ Our duty then is to ascertain if defendant Saddler failed to explain or deny any fact of evidence that was within the scope of relevant cross-examination.[8] The issues before the jury depended to a large extent on the relative weight and credence the jury would give to the conflicting testimony of the principal witnesses, Mrs. Overfield and defendant Saddler. Mrs. Overfield testified in detail to the conduct and activity of her assailant in the period before and during the robbery; Saddler by his testimony attempted to account for his whereabouts in the critical time established by the People's evidence. Thus, the propriety of the instruction is not controlled or limited, as in *Tealer,* by the scope of permissible cross-examination.

There appear no facts or evidence in the prosecution's case within Saddler's knowledge which he did not explain or deny. There is no indication that he failed to disclose any facts within his knowledge that would have shed further light on the robbery. There were contradictions between Saddler's testimony and that of the prosecution witnesses, but a contradiction is not a failure to explain or deny. Thus, Saddler's testimony that he sometimes smoked Kool cigarettes if offered to him but never "requested" them and Officer Session's testimony that on occasion Saddler requested a Kool cigarette from him establishes a clear conflict in

---

[8]Language in *People* v. *Richardson* (1978) 83 Cal.App.3d 853, 865 [148 Cal.Rptr. 120], which appears to place upon a jury, in the first instance, the duty of determining whether a defendant did in fact deny or explain all of the evidence against him, is hereby disapproved.

the evidence, but it does not constitute, as the People suggest, a failure to explain or deny.[9]

The People's contention that the instruction was proper because Saddler never denied on the stand that he committed the robbery appears a hypertechnical view of the evidence. The defendant testified to an alibi, to being elsewhere; he gave a full testimonial account of his whereabouts in the critical time and, thus, in effect denied the charged offense. (See *People* v. *Perez, supra,* 65 Cal.2d at p. 621.)

Since there were no facts or evidence in the People's case which defendant failed to explain that were in his particular knowledge to explain, we conclude that there was no support in the record for an instruction on drawing of adverse inferences from a failure to explain or deny.

■ There remains the question whether the instructional error was prejudicial and requires reversal. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) There was clear conflict between Mrs. Overfield's identification of defendant on the one hand and defendant's alibi on the other. There was little corroborating evidence other than that defendant sometimes smoked the brand of a cigarette which Mrs. Overfield said the robber left at the scene. Mrs. Overfield's identification of defendant, however, was positive. The circumstances of the robbery gave her ample time to observe and study her assailant, and she observed him before she became a victim as well as afterwards. She testified that the motel desk

[9]We reject the prosecution's contention that there were other material gaps in defendant's explanation of his conduct in the crucial period. It is suggested, for example, that although defendant admitted owning a knife, he failed to state whether he was carrying it on the evening in question. Defendant testified he was unsure whether he had the knife that evening. His unsureness was entirely consistent with his testimony of a peaceful evening of activities that gave him no reason to be conscious of whether he had the knife with him.

It is also asserted that defendant failed to testify whether he owned or drove a light colored compact car on the night in question. Defendant was not asked whether he owned such a car or any car, but he was asked to name and did name persons he knew who had owned light colored compact cars. Further, Officer Sanders testified for the defense that when he went to defendant's house, within four minutes after the police learned of the robbery, he saw a light colored compact car next to the house and ascertained by feeling parts of it that it had not been recently driven.

And finally, it is suggested that defendant failed to explain what he did after he emerged from the bathroom which, according to some testimony, could have been as early as 12:40 a.m., in sufficient time to commit the robbery which occurred sometime after 1 o'clock. Since, by all accounts however, defendant was still in the bathroom when Officer Sanders arrived, *after* the robbery had been committed, defendant's activities after he came out of the bathroom can have no relevance to the perpetration of the robbery.

area was well lighted. In further support of her identification, we note that she was asked to view a total of 68 photos on 3 occasions, rejecting all until shown a photo of defendant. We are mindful that the challenged instruction was not given in the previous trial which resulted in a hung jury. Nevertheless, the circumstances of the robbery, the strength of the identification testimony, and the fact that the jury reached its verdict after one and a half hours of deliberation, persuade us that the instructional error was harmless. Furthermore, the jurors were instructed in accord with CALJIC No. 17.31 that they were to "disregard any instruction which applies to a state of facts which you determine does not exist." While such an instruction does not render an otherwise improper instruction proper, it may be considered in assessing the prejudicial effect of an improper instruction.

■ In a second assignment of error, defendant contends that he was denied due process and a fair trial in that the state did not preserve evidence crucial to the defense, citing *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361]. He refers to the loss or destruction of the Kool cigarette which was turned over to the police by Mrs. Overfield. We need not reach the applicability of *Hitch* to the instant circumstances for defendant did not raise the issue in the trial court. When the officer testified concerning the cigarette, defense counsel merely interposed a best evidence rule objection.

The judgment is affirmed.

Tobriner, J., Clark, J., Richardson, J., and Newman, J., concurred.

BIRD, C. J.—I agree with the majority that instructing the jury in the language of the fourth sentence of CALJIC No. 2.62 (1979 rev.) is permitted by statute (Evid. Code, § 413) and does not, under the facts of this case, violate due process of law or the privilege against self-incrimination. Nevertheless, CALJIC No. 2.62, as presently drafted, has serious defects in both form and content.

First, CALJIC No. 2.62 focuses jury attention solely upon the *negative*, potentially *inculpatory* aspects of an accused's testimony; i.e., it only informs the jurors they may draw inferences "unfavorable to the defendant" from his *failure* to explain or deny any evidence against him. The instruction omits to point out the reverse side of that coin, i.e., that inferences *favorable* to the accused may reasonably be drawn if there are no such gaps in his testimony.

In addition, the challenged portion of CALJIC No. 2.62 singles out the *accused's* testimony for its special negative scrutiny. Neither this instruction nor any other in the CALJIC repertoire authorizes the jury to draw similar inferences from a comparable failure to explain or deny on the part of other witnesses in a trial. This is so, despite the fact that " 'It has been repeatedly held to be improper for the court to single out a particular witness and to charge the jury how his evidence should be considered.' " (*People* v. *Lyons* (1958) 50 Cal.2d 245, 271 [324 P.2d 556], quoting from *People* v. *McDonnel* (1949) 94 Cal.App.2d 885, 889 [211 P.2d 910]; accord, *People* v. *Quon Foo* (1922) 57 Cal.App. 237, 241 [206 P. 1028].)

Moreover, the negative inferences from an accused's failure to explain or deny can be reasonable only if the gaps in his testimony are intentional or knowing. Where a testifying accused has "failed to explain or deny [some] evidence or facts against him . . . which he can reasonably be expected to deny or explain" (CALJIC No. 2.62) but that failure is unintentional or could have been remedied if the deficiency had been brought to his attention, then the drawing of "unfavorable" inferences therefrom would be illogical and unreasonable. CALJIC No. 2.62 omits to so inform the jury.[1]

In view of the shortcomings in CALJIC No. 2.62, trial judges should exercise extreme restraint in giving the instruction in its present form. Moreover, it would be eminently prudent for the distinguished members of the CALJIC Committee to consider either the elimination of CALJIC No. 2.62 altogether or its replacement with a more comprehensive, informative, and balanced instruction.[2] (Cf. *People* v. *Phillips* (1966) 64 Cal.2d 574, 587-588 [51 Cal.Rptr. 225, 414 P.2d 353].)

---

[1]Inventive counsel for the prosecution on appeal may be able to calmly comb the transcript of the accused's testimony and discover in it some wholly unforeseen and unforeseeable gap, in order to retroactively justify the giving of CALJIC No. 2.62. (See, for example, some of the imaginative arguments of respondent in the present case, all of which the majority rejects in fn. 9, *ante*, at p. 683.)

Appellant suggests that it would be appropriate to advise the accused of the evidentiary bases for CALJIC No. 2.62, if that instruction is to be given to the jury. Once informed, appellant could reopen his defense for the limited purpose of filling in the gaps, if he can. In that way, whatever gaps remained, if any, might indeed be traceable to a failure to explain or deny and not to mere oversight.

[2]It should also be noted that Evidence Code section 413, upon which CALJIC No. 2.62 is based, leaves entirely with the jury the determination of what inferences to draw against a party based upon his failure to explain or deny evidence against him.

CALJIC No. 2.62 goes beyond section 413 in this respect. It informs the jurors both that such a failure may tend to "indicate the truth of such evidence" and that "among the

**MOSK, J.**—I dissent.

I agree that CALJIC No. 2.62 was improperly given for lack of evidentiary support, but I must depart from the holding of the majority that the error was not prejudicial.

I

The reasonable probability test of *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], governs, of course, in determining whether there has been a miscarriage of justice requiring reversal of the judgment under article VI, section 13, of the California Constitution. In applying that test, we have often emphasized that when a case is "closely balanced" it is more likely to be "reasonably probable that a verdict more favorable to the [appealing party] might have resulted if the error had not occurred." (*People* v. *Hannon* (1977) 19 Cal.3d 588, 603 [138 Cal.Rptr. 885, 564 P.2d 1203]; accord, *People* v. *Wagner* (1975) 13 Cal.3d 612, 621 [119 Cal.Rptr. 457, 532 P.2d 105], and cases there cited.)

In *Hannon* the trial court, over the defendant's objection, instructed the jury that it could consider certain evidence as a circumstance tending to show a consciousness of guilt. (19 Cal.3d at pp. 596-597.) On appeal from the conviction, we held there was no evidence in the record to support the disputed instruction and hence the trial court erred in giving it. (*Id.,* at p. 600.) In assessing the effect of that error, we stressed that the People's case rested in the final analysis on the strength of the identification testimony of one witness, which the defendant had sought to weaken through cross-examination and presentation of an alibi. (*Id.,* at p. 602.) Because "an impermissible impact may have resulted in the minds of the jurors" from the erroneous instruction, we held the closeness of the case to be determinative of prejudice. (*Id.,* at p. 603; see also *People* v. *Anderson* (1965) 63 Cal.2d 351, 360 [46 Cal.Rptr. 763, 406 P.2d 43]; *People* v. *Underwood* (1964) 61 Cal.2d 113, 125-126 [37 Cal.Rptr. 313, 389 P.2d 937].)

As shown by *Hannon,* we must be especially vigilant in appraising prejudice in close criminal cases, where an erroneous instruction might easily tip the delicate balance of evidence against the defendant.

---

inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable."

It would seem advisable that any future versions of CALJIC No. 2.62 more closely track the language of section 413.

## II

In its discussion of the facts the majority acknowledge the weaknesses of the People's evidence, yet decline to hold the error prejudicial. (*Ante,* pp. 683-684.) My examination of the record persuades me otherwise: if ever there were a close case, this is it.

Remarkably absent from the majority's analysis of the evidence is any consideration of the undeniable fact that the robber gave the names "Saddler" and "Brown" to Mrs. Overfield. Yet it is highly unlikely, to say the least, that a person contemplating commission of a crime would volunteer his own name to an eyewitness-victim; and it is equally incredible to conceive that Saddler, after some deliberation, would then offer "Brown" as the alleged maiden name of his nonexistent wife when that name was linked to him through a close relative residing under the same roof as he. This conspicuous fact, I submit, goes far to weaken the credibility of Mrs. Overfield's identification of Saddler as the robber.

As in *Hannon,* the People's case ultimately hinged on the strength of the identification testimony of its key witness, Mrs. Overfield. Contrary to the majority's characterization of her testimony as "positive," the record is replete with instances of her acknowledging lack of clear memory of the events in question. She testified on numerous occasions that she simply could not remember because "it's been a long time"—seven and one-half months elapsed between the date of the robbery and her appearance at trial—and she frankly admitted she had "been trying to forget this since December."

The majority next assert the circumstances of the robbery afforded Mrs. Overfield ample time to observe and study the person who robbed her; yet she testified she did not know how long she talked to her assailant, she had "no idea" how often she looked directly at him, and, not being in the habit of staring at people, she merely "glanced" at him "occasionally." Moreover, Mrs. Overfield admitted she noticed "nothing unusual" about the robber's facial features, and supplied Officer Jones with only a general description of his height, weight, and age. Indeed, when asked the question on cross-examination, she conceded she was not a good judge of age or height. In an in-depth interview conducted by Detective Sessions 13 days after the incident, Mrs. Overfield was asked whether her assailant "had any outstanding physical features which would positively or possibly bring a more closer identification to the individual." She could recall none and allowed that "she did not particularly pay attention to his features or his clothing."

Neither is the photographic identification, on which the majority rely in part, persuasive. Although it is true Mrs. Overfield viewed a total of sixty-eight photos on three occasions, the second of these arrays consisted of only two photos, one of which was of a person of Mexican descent. More importantly, Mrs. Overfield testified that the accuracy of her eventual identification of Saddler's photo was confirmed in her mind when she asked Detective Sessions whether the person she identified was named "Saddler."

Finally, the identification testimony was without any corroboration whatever, for no reliance could reasonably be placed on so ambiguous a circumstance as the fact that Saddler occasionally smoked the popular brand of cigarette found at the scene. On the other hand, Mrs. Overfield's testimony was directly controverted by Saddler's alibi defense, presented by several witnesses. In *Hannon* the People's case likewise rested solely on the identification testimony of one witness, that testimony was weakened on cross-examination, and the defendant presented an alibi. *Hannon* is therefore directly in point, and I deem it to be persuasive on the issue of prejudice.

### III

The prejudicial effect of giving CALJIC No. 2.62 here is dramatically emphasized by the procedural history of the case. Saddler was previously tried on the same charge; after deliberating all of one day and part of the next the jury reported itself hopelessly deadlocked at seven votes to five, and a mistrial was declared. The event is significant because CALJIC No. 2.62 was not given at the first trial, while the remainder of the instructions were essentially identical. The majority acknowledge this difference, but fail to justify their cavalier dismissal of its relevance. (*ante*, p. 684.) As will appear, the evidence at the second trial was substantially the same as—if not less than—the evidence at the first. Accordingly, the most likely explanation for the verdict of guilt was the giving of CALJIC No. 2.62.

My examination of the record reveals that the People and Saddler presented essentially the same witnesses at both trials. There were, moreover, two witnesses for the People at the first trial who did not testify at the second. Another distinction between the trials was that 22 exhibits for the People were admitted into evidence in the first trial, but only 9 in the second. Notably, a pocket knife belonging to Saddler was admitted in the first trial but excluded in the second: in the absence of a showing that the knife offered closely resembled the knife used in the robbery, the

court ruled that its potential for prejudicial effect on the jury outweighted any probative value. (Evid. Code, § 352.)

In view of these differences in witnesses and exhibits between the two trials, a reasonable inference may be drawn that the quantum of evidence at the second trial was no greater, and apparently less, than that at the first trial. Moreover, the three and one-half months intervening between the trials render it probable that the witnesses' recollection would have been less reliable at the second trial. For this reason their testimony would tend to have been less credible, as evidenced by Mrs. Overfield's repeated admissions of a failing memory by the time of her second appearance.

The foregoing unusual procedural history therefore dictates a finding of prejudicial error for reasons wholly apart from the fact this was a close case: it is reasonably probable from the record that the erroneous instruction was the decisive factor in the second verdict. Thus there is present not one, but two, indicia of the "reasonable probability" which requires reversal under the *Watson* test.

## IV

Finally, an error in the majority opinion is its assertion that CALJIC No. 17.31 is relevant in determining whether prejudice resulted from giving an insruction unsupported by any evidence. (*Ante,* pp. 683-684.) The majority correctly states that CALJIC No. 17.31 would not itself save an otherwise improper instruction; but I disagree that it may be given any weight whatever in this determination.

The majority quote the words of CALJIC No. 17.31 but fail to grasp their true significance. In almost every trial the contending parties introduce different versions of the facts; indeed, a single party may also do so in support of alternative theories of the complaint or the defense. The jury will ultimately believe one of those versions and reject the others; yet because the court cannot ascertain what the jury may find, it must instruct on the legal consequences of every factual determination the record would support—i.e., on "the law applicable to any state of facts that may be logically deducible from any of the evidence, regardless of the weight or credibility of that evidence, which are within the sole province of the jury. . . ." (*People* v. *Spraic* (1927) 87 Cal.App. 724, 732-733 [262 P. 795]; accord, *People* v. *Palmer* (1946) 76 Cal.App.2d 679, 686 [173 P.2d 680].) The sole and simple purpose of CALJIC No. 17.31 is

to caution the jury that it should disregard any instruction relating to a state of facts that it does not find to be true.[1]

This purpose is plainly written, moreover, on the face of the instruction itself. It provides in relevant part that "You have been instructed as to all the rules of law that *may be* necessary for you to reach a verdict. Whether some of the instructions will apply will depend upon *your determination of the facts.* You will disregard any instruction which applies to a state of facts which *you determine* does not exist." (Italics added.) The emphasized language clearly focuses the jury's attention on purported facts that it determines from the evidence are not true.

None of this, however, is pertinent to the issue before us. As the majority acknowledge, it is for the court and not the jury to determine whether there is any evidence to support a requested instruction. Here the error occurred when the court gave an instruction devoid of such support—i.e., an instruction on a state of facts that the jury could not have found to be true. In assessing the probability of prejudice from that error, it is obviously irrelevant that the jury was also told to disregard any instruction on a state of facts it could have found true but did not. CALJIC No. 2.62 is simply not such an instruction.

Not only does the majority's reliance on CALJIC No. 17.31 contribute to their erroneous affirmance of this tainted conviction, it will return to haunt us in many cases yet to come. The instruction, as noted, is given as a matter of routine in virtually every jury trial. Under the majority's view, however, it will inevitably be invoked by the People to minimize the prejudicial effect of any instruction—not simply No. 2.62—given without factual support. In such a context the *Watson* test is in danger of becoming a casualty.

I would reverse the judgment.

---

[1]The modest intent of this instruction is confirmed by its placement in the CALJIC collection, i.e., among the general "cautionary" instructions given in virtually every case. (See, e.g., Nos. 17.30 [jury not to take cue from the judge], 17.40 [jury's duty to deliberate], 17.41 [how jurors should approach their task].)