Filed 1/24/14  P. v. Zayer CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B246270 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA 098459) |
| v. | |
| BASEM ELIAS ZAYER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Jon R. Takasugi, Judge.  Affirmed as modified.

Landra E. Rosenthal, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## SUMMARY

A jury convicted defendant Basim Elias Zayer of making criminal threats (Pen. Code, § 422, subd. (a)), a felony.[1]  The jury could not reach a verdict on a misdemeanor battery charge.  On appeal, defendant contends there was insufficient evidence of criminal threats and, in the alternative, that the jury should have been instructed on the lesser included offense of attempted criminal threat.  Defendant also contends the trial court erred when it instructed the jury with CALCRIM No. 361 (a testifying defendant's failure to explain or deny evidence against him).  We find no prejudicial error and affirm defendant's conviction, but order the judgment modified to include additional presentence conduct credits.

## FACTS

The victim, Joseph Guzman, owned a manufacturing company on Signal Drive in Pomona and lived nearby with his family.  Mr. Guzman and a business associate, Thomas Zimmerman, were returning from lunch at a nearby restaurant, and drove into the parking lot of Mr. Guzman's business.  Defendant was in the parking lot, trying to get the attention of one of Mr. Guzman's employees.  Mr. Guzman pulled up in the car and asked defendant "what's up, meaning 'can I help you.' "  Defendant asked Mr. Guzman for the name and phone number of a neighboring businessman.  Mr. Guzman told defendant he did not know the name or phone number.  Defendant responded by saying, "You just don't want to fucking deal with me.  Go fuck yourself."  This shocked Mr. Guzman, who got out of his car and told defendant to "get the fuck out of my parking lot."  Defendant punched Mr. Guzman on the left side of his mouth, knocking off his glasses (which were hanging from the collar of his shirt).  When Mr. Guzman bent to retrieve his glasses, defendant hit him again.  Mr. Guzman "got thrown back a little bit and then . . . stood up and proceeded to push [defendant] out of the property with [his] hands."

---

[1]     All statutory references are to the Penal Code.

2

While Mr. Guzman was pushing defendant, "[defendant] wanted to wrestle, so I pushed him away more." Defendant turned around and started walking away from the property, and Mr. Guzman followed him so he could close the gate behind defendant. Then Mr. Guzman decided to find out whether defendant would walk away or get into a vehicle, so he followed defendant outside the property. Then, defendant stopped and "started getting really verbally aggressive." Defendant "was calling me [(Mr. Guzman)], 'You're an idiot, you're a moron, you don't know who you're dealing with. I'm going to come back and kill you.' "

Mr. Guzman was "[k]ind of stunned, not sure how to interpret it." Defendant "sounded very serious" and "was very angry." "In a way I [(Mr. Guzman)] was [afraid], but I wasn't really taking it all in." He was concerned for his safety, and for the safety of his family, who lived near his business.

Then, defendant started walking away, and Mr. Guzman followed him to see if he would get in a vehicle. Mr. Guzman took out his cell phone to call 911, and was looking at the screen when defendant turned around and hit him again, on the left cheek. The two men then "fought a little bit." Defendant "was throwing some punches and [Mr. Guzman] was trying to block them." Defendant threw more than five punches at Mr. Guzman, who was hit several times, and Mr. Guzman threw several punches and hit defendant on his face and chest. After that, defendant turned around and started walking away. Mr. Guzman followed him and was able to call 911, telling the operator what had happened and the direction defendant was headed.

As Mr. Guzman was calling 911, defendant "proceeded to cuss and yell at me and call me names and continued to threaten." This time, "[i]t was the same 'You're an idiot, you're a moron, you don't know who you're fucking with. I'm going to come back and kill you.' Over and over." Mr. Guzman took this threat "[v]ery seriously. That's why I dialed 911."

Mr. Guzman saw where defendant was going, but did not continue to follow him. Mr. Guzman was near the corner of Signal and Grand, and defendant went across to the opposite side of the intersection and stood there. As Mr. Guzman watched, defendant

3

rolled up "what I thought was a joint," a marijuana cigarette (it was not).  Eventually, the defendant walked out of sight, into an alley.

Mr. Guzman waited for about 10 minutes before the police arrived.  During this time, he was not afraid because "a few people had gathered then at the corner." Mr. Guzman's "biggest concern" was that defendant "might come back sometime in the future" and that was why he "wanted to make sure that the police caught" defendant. "His threats sounded very serious and my family is right next to the business.  I was afraid for what he would come back and do."  When the police arrived, Mr. Guzman directed them to where he had last seen defendant.  After a few minutes, the police returned with defendant, and Mr. Guzman identified him.

Officer Jorge Aleman, who spoke to Mr. Guzman at the scene, testified that Mr. Guzman told him that he was "trying to get a license plate or address so [defendant] didn't get away," and "that was because he was scared of [defendant] . . . ."  When Officer Aleman talked to Mr. Guzman, he appeared "[s]haken up.  You could tell he'd been involved in some sort of struggle, so he was a little shooken [*sic*] up."  Officer Aleman had to ask Mr. Guzman certain questions multiple times because of his emotional state.  Another officer, Rolando Betancourt, did not interview Mr. Guzman, but observed his demeanor and said, "He looked shaken."

Defendant was arrested and charged by information with violations of section 422, subdivision (a) (criminal threats), a felony, and section 242 (battery), a misdemeanor. The criminal threats charge was alleged to be a serious felony.  The information also alleged defendant suffered one prior serious felony conviction (§ 1192.7, § 667, subd. (a)(1)), also alleged as a prior strike conviction (§ 1170.12, subds. (a)-(d) & § 667, subds. (b)-(i)), and three prior prison terms (§ 667.5, subd. (b)).

Defendant testified in his own defense.  He said he was going to a business across the street from his place of work in order to get an estimate for cement.  He had just walked in when a truck pulled in behind him.  He approached to talk to the driver (Mr. Guzman), saying he would like to have an estimate on cement, and Mr. Guzman told him that business was next door, not Mr. Guzman's business.  Mr. Guzman said, "Go

4

and ask him."  Defendant asked Mr. Guzman if he knew the name or phone number of the cement business, and Mr. Guzman said, "Get the hell out of my property, you piece of shit."  Defendant did not curse at Mr. Guzman; defendant turned and walked away.  He walked three or four feet, heard the truck door slam hard, and heard steps coming toward him.  He turned around and found Mr. Guzman right behind him, and Mr. Zimmerman on the side of the truck, "both of them aggressively coming toward me . . . ."

Defendant said he did not hit Mr. Guzman when he got out of the truck, and that Mr. Guzman punched defendant first.  Defendant "started going backwards, worrying about the two people."  Defendant started running backwards.  Mr. Guzman was swinging and kicking.  Defendant backed up out of the property and into the street.  When he got to the street, he turned and walked away from the two men.  He did not threaten them in any way, and did not make any statements when he turned to walk away.

When defendant saw Mr. Guzman and Mr. Zimmerman coming at him, he kept his fists up to protect his face.  When Mr. Guzman hit him, he "kept backing up all the way to the street."  His hands were in front of his face at about the forehead, with his forearms protecting his face area.  He kept his hands in that position "[f]rom the time [Mr. Guzman] attacked me by his truck, all the way down around the corner from his property, down halfway to my landlord property."

When defendant was on the street and about 150 feet away from Mr. Guzman's property, he told Mr. Guzman that he was "going to sue him for hitting me." Mr. Guzman laughed and pulled out his telephone, and defendant said, "I hope you're calling the police."  Defendant never made any statements to Mr. Guzman that he was going to kill him, or that he was going to come back and kill him; defendant never threatened Mr. Guzman in any way.  When defendant was going down the street away from Messrs. Guzman and Zimmerman, he was "going home to call the police."

Defense counsel asked defendant whether he hit Mr. Guzman three to four times without any provocation, and defendant replied:  "My hand never lift at him more than once accidentally, because when you go backwards you're going to need support so you do not fall, so you move.  Even if you go backwards, you can swing your hands, so I was

5

going to swing my hand and my hands hardly slipped between his lip and soft area, you bleed a little." Defendant was trying to get away from Mr. Guzman during the whole encounter and never attacked Mr. Guzman. On cross-examination, defendant said he never hit Mr. Guzman on purpose. When the prosecutor asked, "It was just an accident because you were moving backwards and your hand just came forward and kind of hit him in the lip?" defendant replied, "True."

The jury found defendant guilty on the criminal threats count, but could not reach a verdict on the battery count. The court found true defendant's second degree robbery conviction (§ 211) and a conviction for making a false bomb threat (§ 148.1, subd. (c)), and found defendant served a prison sentence on those convictions. The court also found defendant had served a prison term for a violation of section 273.5, subdivision (a) (infliction of injury on a spouse or cohabitant).

Defense counsel moved to dismiss the strike in the interest of justice, arguing that defendant had a long history of mental illness and had stopped taking his prescribed medication when this incident occurred. The court denied the motion. After hearing arguments on sentencing, the court sentenced defendant to the midterm (two years), doubled for the strike, plus five years for the prior felony conviction (§ 667, subd. (a)(1)), for a total of nine years. The court imposed but suspended three 1-year terms for the prison priors.

The court awarded 176 days of actual custody credits, plus 88 days of conduct credits, and imposed fines not at issue on appeal. The misdemeanor battery charge was dismissed in the interest of justice.

Defendant filed a timely appeal.

## DISCUSSION

Defendant challenges the sufficiency of the evidence; contends the jury should have been instructed on the lesser included offense of attempted criminal threat; and asserts the jury should not have been instructed on a testifying defendant's failure to explain or deny evidence against him. Except for defendant's claim he is entitled to

6

additional presentence conduct credits (a claim respondent concedes), we find no merit in defendant's arguments.

### 1. Sufficiency of the Evidence

We review a claim of insufficient evidence by determining whether, viewing the whole record in the light most favorable to the prosecution, the record discloses substantial evidence – evidence which is reasonable, credible, and of solid value – from which a reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Osband* (1996) 13 Cal.4th 622, 690.) We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*Ibid.*)

To prove the crime of criminal threat, the prosecution must establish five elements: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*).)

Defendant contends the evidence "did not show Guzman to have been in sustained fear, and [defendant's] statement did not express an unconditional intention immediately to inflict injury," especially "considering the fact that by Guzman's own description of the interaction between the two men, [defendant] kept on walking away." Defendant points out that Mr. Guzman continued to follow defendant, even though the 911 operator told him not to do so, and the evidence did not show his fear was reasonable because defendant kept walking away.

7

We disagree. The evidence showed that defendant repeatedly threatened to come back and kill Mr. Guzman, and that Mr. Guzman took the threat "[v]ery seriously" and "[t]hat's why I dialed 911." The evidence, including the 911 call, showed Mr. Guzman followed defendant because he did not want him to get away. In addition to Mr. Guzman's own testimony that defendant's threats "sounded very serious" and he was "afraid for what [defendant] would come back and do" because his family was "right next to the business," Officer Aleman's testimony confirmed that Mr. Guzman told him that he did not want defendant to get away and "that was because he was scared of [defendant] . . . ." Both Officer Aleman and Officer Betancourt said that Mr. Guzman appeared "shaken." In short, there was sufficient evidence to allow the jury to find all the elements of a criminal threat beyond a reasonable doubt.

## 2. Lesser Included Offenses - Attempted Criminal Threat

Defendant next argues that the trial court should have instructed the jury on the lesser included offense of attempted criminal threat. Again, he is mistaken.

The trial court must instruct the jury, sua sponte, on lesser included offenses "if there is substantial evidence the defendant is guilty only of the lesser." (*People v. Kraft* (2000) 23 Cal.4th 978, 1063.) "On the other hand, if there is no proof, other than an unexplainable rejection of the prosecution's evidence, that the offense was less than that charged, such instructions shall not be given." (*Ibid.*)

In the context of criminal threats, "[a] variety of potential circumstances fall within the reach of the offense of attempted criminal threat." (*Toledo, supra,* 26 Cal.4th at p. 231.) Among other examples of attempted criminal threat, "if a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat. In . . . these situations, only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself." (*Ibid.*)

8

Here, defendant's opening brief nowhere mentions what evidence would support an instruction on attempted criminal threat, saying only that the evidence "left open questions about the elements of the offense." This is because there is no substantial evidence of an attempted criminal threat. We will not reiterate the evidence, already fully described, that established "sustained fear" on the part of Mr. Guzman, and defendant points to no evidence supporting a contrary conclusion. Indeed, defendant's testimony was that no threats were ever made. In short, there was "no proof, other than an unexplainable rejection of the prosecution's evidence, that the offense was less than that charged" (*People v. Kraft, supra,* 23 Cal.4th at p. 1063), so an instruction on attempted criminal threat was not appropriate. (Cf. *People v. Abilez* (2007) 41 Cal.4th 472, 515 ["Although defendant claims the failure to instruct on theft left the jury with an all-or-nothing choice, such a choice did not violate his rights because, on the state of the evidence presented, the crime was either robbery or nothing."].) There was no error.

### 3. The Jury Instruction – CALCRIM No. 361

Defendant contends he was prejudiced when the trial court instructed the jury with CALCRIM No. 361. We are not persuaded.

The jury was instructed, over defense objection, that: "If the defendant failed to explain or deny evidence against him, and if he reasonably could be expected to have done so based on what he knew, you may consider any such failure to explain or deny. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

Our review of a claimed instructional error is de novo.

CALCRIM No. 361 has no constitutional or other infirmity. (*People v. Saddler* (1979) 24 Cal.3d 671, 675 (*Saddler*) [addressing CALJIC No. 2.62, a similar instruction]; *People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1064 [same, CALCRIM No. 361].) Thus, the court's role is to determine if there were any "facts or evidence in the People's case which defendant failed to explain that were in his particular knowledge to explain . . . ." (*Saddler,* at p. 683.) If there were not, it was error to give the instruction.

9

(*People v. Kondor* (1988) 200 Cal.App.3d 52, 57 [the instruction (CALJIC No. 2.62) is unwarranted "when a defendant explains or denies matters within his or her knowledge, no matter how improbable that explanation may appear"].)  A contradiction is not a failure to explain or deny.  (*Saddler*, at p. 682.)

When a defendant testifies and "fails to deny or explain inculpatory evidence or gives a 'bizarre or implausible' explanation, the instruction is proper."  (*People v. Sanchez* (1994) 24 Cal.App.4th 1012, 1029-1030 [CALJIC No. 2.62].)  Thus in some circumstances, plausibility may be a proper consideration in giving the instruction.  (See *People v. Mask* (1986) 188 Cal.App.3d 450, 455 [the instruction (CALJIC No. 2.62) is warranted "if the defendant tenders an explanation which, while superficially accounting for his activities, nevertheless seems bizarre or implausible"]; see also *People v. Belmontes* (1988) 45 Cal.3d 744, 784, quoting *People v. Mask, supra,* at p. 455; *People v. Roehler* (1985) 167 Cal.App.3d 353, 393.)  In general, the precedents show trial courts must proceed with caution in deciding whether to give this instruction.

Defendant argues that his testimony explained "all the facts that could reasonably be considered to be within his knowledge," so the instruction was not applicable and "unfairly called attention to any possible omissions in [defendant's] testimony."  Respondent, on the other hand, points to two "bizarre" or "implausible" answers in defendant's testimony.  Both relate to his testimony that Mr. Guzman was the aggressor who got out of his truck and aggressively came at defendant and hit him.

First, respondent says defendant failed to explain why Mr. Guzman attacked him without provocation.  The prosecutor asked, "And you're saying that Mr. Guzman just attacked you for no reason whatsoever?"  Defendant's answer was:  "I would say he got a trigger on a problem with that cement business, not cause right when I said to him – when he told me, no, you got to go ask him, and I said to him 'Do you know who it is.'  It is a new person who owned the business.  Because I assumed he's the owner, that's when he went mad, upset, harsh, 'Get the hell out of my property, you piece of shit,' and aggressively coming out of the truck. . . ."

10

Second, respondent points to defendant's implausible explanation of the substantial injuries to Mr. Guzman's face. Defendant testified (as quoted in full *ante*, at pp. 5-6) that he never hit Mr. Guzman on purpose, and that his hand hit Mr. Guzman accidentally as he was moving backwards.

The question why Mr. Guzman would hit defendant without provocation relates to Mr. Guzman's motivation, and is not "evidence against [defendant]" that he could "reasonably be expected" to explain or deny. (CALCRIM No. 361.) While it may be inexplicable that Mr. Guzman would hit defendant with no reason, the same might be said of defendant's conduct; the reasons for Mr. Guzman doing so (if he had done so) would not be within defendant's knowledge. In short, defendant's testimony that Mr. Guzman hit him for no reason is not one of the "facts or evidence in the People's case which defendant failed to explain that were in his particular knowledge to explain . . . ." (*Saddler, supra,* 24 Cal.3d at p. 683.)

However, defendant's failure to explain the evidence of significant injuries to Mr. Guzman's face is another matter. Defendant failed to explain how Mr. Guzman's face could have been significantly injured as a result of defendant accidentally swinging his hands while walking backward after Mr. Guzman inexplicably struck defendant. Defendant's explanation, quoted above, was "inherently implausible" (*People v. Mask, supra,* 188 Cal.App.3d at p. 455), and the instruction was therefore proper.

But even if the instruction should not have been given, we would not reverse the judgment. An error in instructing with CALCRIM No. 361 does not require reversal unless it is reasonably probable that defendant would have obtained a more favorable result absent the error. (See *Saddler, supra,* 24 Cal.3d at p. 683, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) There is no such probability in this case.

CALCRIM No. 361 provides language beneficial to defendant. It specifically warns the jury that any failure to deny or explain "is not enough by itself to prove guilt" and then reiterates that the burden remains with the prosecution to prove the defendant guilty beyond a reasonable doubt. The instruction contains discretionary language stating that the jury "may" consider any purported failure to deny or explain. Jurors are

11

presumed to have followed the law. (*People v. Williams* (1995) 40 Cal.App.4th 446, 456.) In addition, the jury was instructed that "[s]ome of the instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." This instruction mitigates any potentially prejudicial effect of giving CALCRIM No. 361. (See *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472 ["the fact that juries are instructed, pursuant to CALJIC No. 17.31, to 'disregard any instruction which applies to a state of facts which you determine does not exist,' also mitigates any prejudicial effect related to the improper giving of CALJIC No. 2.62" (the precursor instruction)]; see also *Saddler*, *supra*, 24 Cal.3d at p. 684.)

Further, as in *People v. Haynes* (1983) 148 Cal.App.3d 1117, 1122, the jurors "closely evaluated the evidence and afforded [defendant] the benefit of all reasonable doubt," as demonstrated by their failure to reach a verdict on the battery count. And, the only failure to explain or deny evidence against defendant that was cited to the jury related to the battery count. Under these circumstances, "any theoretical error occasioned by" CALCRIM No. 361 was harmless. (*Haynes,* at p. 1122.)

### 4.     Additional Presentence Custody Credits

Defendant contends he is entitled to additional presentence conduct credits under section 4019, subdivision (f). Respondent concedes the point, and we agree.

Defendant was arrested on June 27, 2012, for an offense committed that day, and was convicted on October 9, 2012. Defendant was in custody continuously from June 27 through sentencing on December 19, 2012, a total of 176 days. At the hearing, defendant received custody credits of 176 days, but all parties agreed, erroneously, that he was entitled to conduct credits of only 88 days.

Section 4019, subdivision (f) states (and stated at the time of defendant's offense) that: "It is the intent of the Legislature that if all days are earned under this section, a term of four days will be deemed to have been served for every two days spent in actual custody." While prisoners committed for serious felonies were not eligible for credit at

12

this rate under previous law, the Legislature deleted that restriction in 2010. (*People v. Brown* (2012) 54 Cal.4th 314, 318, fn. 5.) Consequently, defendant should have received 176 days of conduct credits, for a total of 352 days of presentence credit.

## DISPOSITION

The matter is remanded to the trial court with directions to modify the abstract of judgment to state that defendant has earned 352 total credits and 176 local conduct credits. The trial court is directed to forward the modified abstract to the Department of Corrections and Rehabilitation. The judgment as modified is affirmed.

GRIMES, J.

We concur:

RUBIN, Acting P. J.

FLIER, J.

13