Filed 4/27/15  P. v. Brown CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JACORY BROWN,<br><br>    Defendant and Appellant. | C074292<br><br>(Super. Ct. No. 12F00019) |

Defendant Jacory Brown fired multiple rounds from the back seat of a friend's car into the side of another vehicle, seriously injuring two of that vehicle's passengers, Nehemiah and Garvin Johashen.[1]  He was convicted by jury of two counts of attempted premeditated murder, two counts of assault with a firearm, one count of shooting at an occupied vehicle, and one count of possession of a firearm by a convicted felon.

---

[1]    Because the victims have the same last name, we refer to them by their first names for clarity.

Various firearm and great bodily injury enhancement allegations were also found to be true. The trial court sentenced defendant to serve an aggregate indeterminate prison term of 89 years to life plus a consecutive determinate term of 7 years.

On appeal, defendant contends: (1) the prosecutor committed prejudicial misconduct by vouching for a prosecution witness; and (2) the trial court prejudicially erred by instructing the jury with CALCRIM No. 361, i.e., "[i]f the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence."

We affirm. As we explain, the first of these contentions is forfeited because defendant did not object to the prosecutor's alleged misconduct or request a curative admonition. (*People v. McDowell* (2012) 54 Cal.4th 395, 436.) We also reject his alternative argument that defense counsel's failure to object and request such an admonition amounted to ineffective assistance of counsel. Because the prosecutor's argument did not amount to improper vouching, counsel was not ineffective for failing to object and defendant suffered no prejudice. With respect to defendant's second contention, we agree CALCRIM No. 361 should not have been given to the jury in this case, but conclude the error was harmless.

FACTS

We begin with undisputed facts. On November 13, 2011, at about 8:30 p.m., Nehemiah and Garvin walked to a fast food restaurant on Elkhorn Boulevard in North Highlands. At the restaurant, Nehemiah called a friend, Trayvion Pointer, and asked for a ride. Pointer, who was on a date with Marquell Witten at the time, drove to the restaurant with Witten in the front passenger seat and picked up Nehemiah and Garvin, who got into the back seat. Pointer was driving a Volvo.

2

Meanwhile, defendant was in the back seat of a Chevy Malibu in the restaurant's drive-through. The Malibu belonged to Alexander Ford, who was seated in the front passenger seat. The driver's identity was disputed. Defendant had previously been "jumped" by friends of Nehemiah and Garvin over the outcome of a dice game. Because of this, "hard" looks were exchanged between occupants of the two vehicles. The Volvo then exited the restaurant parking lot, drove eastbound on Elkhorn Boulevard, and entered Interstate Highway 80 (I-80) heading westbound. The Malibu followed, caught up to the Volvo as it entered the freeway, and pulled up along the driver's side of the car, at which point the Malibu's backseat passenger lowered the window and opened fire with a large caliber handgun. Bullets struck both Nehemiah and Garvin, causing great bodily injury.

The dispute at trial was over who occupied the back seat of the Malibu at the time of the shooting. Ford testified for the prosecution and implicated defendant. Defendant testified in his own defense and implicated Ford. We provide a detailed summary of their respective testimony. We then set forth the evidence corroborating Ford's account, including victim identification of defendant as the shooter prior to trial, although these identifications were recanted at trial.

### Ford's Testimony

Ford testified he met defendant through a mutual friend, Elijah Nevarez, about a week before the shooting. Ford, Nevarez, Nick Buzo, and another man drove from Stockton to Sacramento to "find a party, drink." Nevarez drove Ford's car. They ended up at an apartment belonging to one of Nevarez's friends, a man named Paul. Defendant was also at Paul's apartment. At some point, Ford and Paul got into an altercation. Ford explained: "[Paul] got drunk and angry and he got mad at me for being in a side bedroom for a second. And [defendant] came and pulled him away from me and told him not to treat his guest like that . . . ." Ford was unsure whether he and his friends stayed the night

3

at Paul's apartment or rented a motel room, but they returned to Stockton the following day.

About a week later, on the day of the shooting, Ford, Nevarez, and Buzo again drove from Stockton to Sacramento. Nevarez again drove Ford's car. After picking up another man, who went by the name "Gwop," at Paul's apartment, they drove to a motel to get a room and party. At some point in the afternoon, after drinking alcohol and smoking marijuana in the room, they also picked up defendant. Later in the evening, Ford and Nevarez decided to drive to a fast food restaurant to get some food. As they were getting into Ford's Malibu, Nevarez behind the wheel and Ford in the front passenger seat, defendant decided to join them and got into the back seat. Nevarez drove to the restaurant and pulled into the drive-through. When they got to the front of the line, Pointer's Volvo pulled in front of the Malibu and stopped, blocking their exit from the drive-through. The Volvo then pulled around so it was parallel to the Malibu. Defendant said: "Those are the guys that want to kill me. Don't look at them because the one always carries a .40 with a 30-round clip on him." Defendant also said: "Don't worry, I have protection."

The Volvo then pulled out of the parking lot, traveled eastbound on Elkhorn Boulevard, and got onto I-80. The Malibu followed and caught up to the Volvo on the on-ramp. According to Ford, no one told Nevarez to "[c]atch the car," but as the Malibu approached the Volvo, defendant said: "I should get them before they get me." Ford protested: "I don't want to do that in my car because I don't want to get in trouble for this." Defendant and Nevarez both assured him they would not "snitch." As the Malibu pulled up beside the Volvo, Ford heard "loud bangs" coming from behind him in the car and "ducked down." Ford then looked in his rear view mirror, saw the Volvo slide off of the freeway, and said: "Man, I think you killed them." Defendant responded: "No snitching." Nevarez drove back to the motel. Inside the room, defendant told Gwop:

4

" 'You remember the niggas that said they were going to kill me?' "  " 'Well, they know I'm not some little bitch that they're just going to punk.' "

### *Defendant's Testimony*

Defendant confirmed he met Ford at Paul's apartment and intervened in an altercation between Ford and Paul. According to defendant, Ford was bragging to Paul about Stockton being more "active" than Sacramento, which defendant understood to be a boast of toughness, and "Paul basically wanted to test him and see if he was all talk." After defendant intervened, Ford thanked him for "having his back." Ford then rented a motel room, where defendant drank alcohol and smoked marijuana with Ford and his companions before they returned to Stockton. Defendant also testified he had several interactions with Ford over the span of a few weeks between their initial meeting at Paul's apartment and the night of the shooting. According to defendant, he helped Ford sell four pounds of marijuana during this time.

The day of the shooting, Ford picked defendant up at Paul's apartment. Defendant confirmed Ford's account of who was with him, except for the addition of a man who went by the name "Least-O."[2] Defendant also confirmed Ford rented a motel room, where the group drank alcohol and smoked marijuana. Later that night, according to defendant, he decided to leave the party and caught Ford and Least-O as they got into Ford's car to pick up some food. Defendant asked Ford, who was "extremely drunk" and seated in the front passenger seat, for a ride to Elkhorn Boulevard and Andrea Boulevard, which happened to be where the fast food restaurant was located. Ford agreed. Defendant got into the back seat. Least-O drove to the restaurant and pulled into the drive-through. At this point, Ford noticed someone in the restaurant "looking at the car

---

[2]     Ford testified that Least-O was Nevarez's nickname. Defendant testified that Least-O was a separate person.

5

real, real hard." Defendant looked up, saw Nehemiah and Garvin in the restaurant, and said: "Yeah, they -- those are the individuals that mess with the people -- that hang out with the people that jumped me."**3**

Ford became "agitated" and "aggressive" and said: "Are those the people that jumped you? The people that jumped you?" Ford then "started muggin' 'em real, real hard." Defendant believed Ford felt he owed defendant because defendant "had his back with Paul" and tried to diffuse the situation by telling Ford: " 'Nehemiah carries a gun' " and " 'you need to calm down.' " The "aggressive" looks continued when Nehemiah and Garvin got into Pointer's Volvo, which pulled in front of Ford's Malibu at the front of the drive-through line. Defendant again told Ford to " 'calm down.' " Ford responded: " 'I ain't no little bitch.' " When the Volvo drove away, defendant asked to be dropped off behind a convenience store in the same parking lot. Ford and Least-O complied. As defendant got out of the car, Ford said: "I'm going to show you how we get down in Stockton." He then retrieved "something" from his trunk and got into the back seat. The Malibu departed. Defendant then sent a text message to a friend named "Bear," who picked him up. He spent the next two or three hours with Bear. At some point, an unidentified person called defendant and told him Nehemiah had been shot. Gwop then called and told defendant to come back to the motel room, which he did. In the motel room, Ford was "drunk and bragging" that he "laid 'em down."

### Corroboration of Ford's Testimony

After the shooting, the Volvo slid off of the freeway and came to a stop as Pointer passed out for a brief moment and released his foot from the accelerator. When he

---

**3**    Defendant explained he had no problems with either Nehemiah or Garvin, but three unidentified friends of theirs had previously "jumped" him over the outcome of a dice game; however, according to defendant, he "end[ed] up beating them up -- all three of them" and "got to keep all [his] stuff."

regained consciousness, Pointer drove to a nearby motel. Law enforcement and medical personnel arrived a short time later. Nehemiah and Garvin were transported to the hospital, where they each provided a brief statement.

Nehemiah stated he clearly saw defendant's face as the Malibu's back window rolled down, just before a gun emerged and started shooting. He provided a name: "Jacory or Cory." He also provided an accurate description: "A [B]lack male, early twenties, dark-skinned, wearing a do-rag. He's approximately six foot tall and had an athletic build." With respect to the Malibu's driver and front seat passenger, Nehemiah said "they might have been two white guys or one possibly Hispanic." Ford is White; Nevarez is Hispanic. Nehemiah also explained he believed the shooting involved a "dice game," where someone owed defendant $300, and one of Nehemiah's friends "got beat up over this money." Garvin also stated the shooter was "a [B]lack male" with "short hair" and "wearing a do-rag," although he believed the shots came from the front passenger seat.

About a month later, both Nehemiah and Garvin picked defendant out of a photographic lineup. After Nehemiah chose defendant's photo, which was in the number five position, he wrote in the comments section: "I'm almost one hundred percent number five is the person who shot me and my little brother." After Garvin chose defendant's photo, he wrote in the comments section: "Number five looks like him."[4]

Defendant and Ford were each arrested. After Ford was released on bail, defendant sent him a letter, through another inmate. Because a certain statement in this letter is the evidence the Attorney General argues defendant failed to explain in his

---

**4** At trial, Nehemiah and Garvin recanted these identifications. They also acknowledged being a "snitch" is not looked upon favorably "out there on the streets."

7

testimony, we set forth the contents of the letter in the discussion below.  For present purposes, it will suffice to note Ford understood the letter to be a warning against "snitchin[g]" on defendant, a reasonable interpretation.  Accordingly, the letter was admitted into evidence to show defendant's consciousness of guilt.

DISCUSSION

I

### *Prosecutorial Misconduct/Ineffective Assistance of Counsel*

Defendant contends the prosecutor committed prejudicial misconduct by vouching for Ford's veracity in his rebuttal argument.  This contention is forfeited because defendant did not object to the prosecutor's alleged misconduct or request a curative admonition.  (*People v. McDowell*, *supra*, 54 Cal.4th at p. 436.)  Anticipating forfeiture, defendant argues in the alternative that defense counsel's failure to object and request such an admonition amounted to ineffective assistance of counsel.  We disagree.  Because the prosecutor's argument did not amount to improper vouching, counsel was not ineffective for not objecting and defendant suffered no conceivable prejudice.

**A.**

*Additional Background*

During the defense closing argument, counsel for defendant argued Ford's testimony should not be believed because, among other things, of the "amazing deal" he received in exchange for his testimony.  As defense counsel described the plea agreement:  "The agreement wasn't just come in here and say whatever you want to say and you're off the hook.  The agreement was that [Ford] had to give the prosecution something useful."  Defense counsel continued:  "And he wasn't told that, 'Hey, you come in here and you testify and we'll see what happens.  Just do the right thing and take your chances.'  No.  He's told, 'You come in here and say those things that help our case

8

and you get a hundred and eighty day sentence, instead of 25 to life.'  That is huge.  He has every single reason to come in here and tell the prosecution what the prosecution wants to hear."

In rebuttal, the prosecutor addressed defense counsel's mischaracterization of the agreements entered into between Ford and the prosecution:

"Now I want to talk about these agreements.  Much was made of these agreements yesterday.  And I know they're here somewhere.  They're in these stack of exhibits -- there they are -- that you're going to have available to you.

"And [defense counsel] said they say things in there like, 'If you give us something useful.'  Right?  If -- essentially, if you tell us what we want to hear.  I'm not going to read them to you.  They're fairly long, particularly the plea agreement.  It's fairly long.  The interview agreement is far less long.  I assure you -- I'm begging you to read them -- you won't find those words in there.

"I'll give you an example, just an example.  The only promises or assurances made to Alexander Ford in consideration of his statement at this time are as follows:

"'No portion of this statement made pursuant to this agreement, or evidence obtained as a result of this statement, will be used by the prosecution in the prosecution's case in chief -- meaning our evidence -- in any prosecution of Alexander Ford.'  (As read.)

"Meaning, if you're not -- if you don't end up being a witness -- if you still end up going to trial, the only promise we're making you is that we won't use it against you.  Right?  Because who's going to come in and talk to us if they think we're just going to turn around and say, 'Okay, thanks.  Have a nice day.  We're going to use it to prosecute you'?

"'Should he testify as a witness in the trial, this statement may be utilized to question him during his examination and testimony as a witness.  The contents of this

statement will be discovered to counsel for [defendant], as well as any other affected party by the contents of this statement.' (As read.)

"'Overriding all else, it is understood that this agreement extracts from Alexander Ford an obligation to do nothing other than candidly reveal the whole truth about all matters of inquiry. This is true, even if the truth is different from what Alexander Ford may have communicated to any other individual at any other time regarding the events in question.' (As read.)

"Right? This is sometimes referred to as 'Queen for a day.' You get to come in and say what you want to say. If you come in and it's all inconsistent with the other evidence, then maybe we don't use you as a witness. And the only thing you get promised is that we won't use it against you in our case in chief. But if you testify at your trial, then we will. Right? Nothing's promised up front.

"Then, after his statement and a review of the evidence, including the video, what else comes out of that? Elijah Nevarez, the photographs of him, they match the surveillance video. They're consistent. The information he says about Elijah Nevarez being friends with the defendant, bam. All of a sudden here pops up these police reports from 2007, corroborating that. Right? At which point, he enters into a plea agreement, which is way too long to read, but also available for you. And I ask you to read it. It includes language about, 'If you come to court and you testify.' The judge is in control of your fate, in more ways than one. And you can read it. It's all signed and dated and stamped as an exhibit. But I can tell you, it doesn't say what was represented to you yesterday."

Defense counsel did not object to this line of argument.

## B.

### *Analysis*

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.,* quoting *United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.) "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.)

We must first determine whether defense counsel's failure to object on vouching grounds fell below an objective standard of reasonableness. "A prosecutor may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom."' [Citation.] But a 'prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record.'

11

[Citation.]" (*People v. Turner* (2004) 34 Cal.4th 406, 432-433; *People v. Linton* (2013) 56 Cal.4th 1146, 1207 [misconduct to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness].)

Defendant argues the prosecutor "ran afoul of these principles" during his rebuttal argument by "indicat[ing] that his office would not use Ford's testimony if he thought Ford was lying. Ergo, the fact that he testified showed the prosecution's belief that Ford was telling the truth <u>and</u> that it made that determination before using him at trial based on other unidentified evidence consistent with Ford's story." We disagree. Viewed in context, the prosecutor was describing the agreements entered into between Ford and the prosecution in order to clear up defense counsel's mischaracterization of these agreements. He then specifically described two pieces of evidence that corroborated Ford's pre-trial statement and prompted him to offer Ford a plea deal in exchange for his testimony, i.e., Nevarez's appearance in the fast food restaurant's surveillance video driving the Malibu and a police report indicating Nevarez and defendant were contacted together in 2007. However, since each of these items of evidence was before the jury at trial, this is not a case in which the prosecutor impermissibly bolstered Ford's veracity by referring to evidence outside the record. (See *People v. Turner*, *supra*, 34 Cal.4th at pp. 432-433; *People v. Linton*, *supra*, 56 Cal.4th at p. 1207.)

Because the prosecutor did not improperly vouch for Ford's veracity, defense counsel was not ineffective for failing to object on those grounds. For the same reason, defendant suffered no prejudice.

## II

### *Instructional Error*

Defendant also claims the trial court prejudicially erred by instructing the jury with CALCRIM No. 361. He did not object to this instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's

12

substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) While we agree the instruction should not have been given to the jury in this case, no miscarriage of justice occurred.

As given to the jury in this case, CALCRIM No. 361 provides: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

In deciding whether this instruction was properly given, we must determine whether defendant failed to explain or deny any evidence in the prosecution's case, within defendant's knowledge, and within the scope of relevant cross-examination. (*People v. Saddler* (1979) 24 Cal.3d 671, 682 (*Saddler*) [considering challenge to CALCRIM No. 361's substantively similar predecessor CALJIC No. 2.62].) We also note that "contradiction between the defendant's testimony and other witnesses' testimony does not constitute a failure to deny which justifies giving the instruction. [Citation.] '[T]he test for giving the instruction is not whether the defendant's testimony is believable. [The instruction] is unwarranted when a defendant explains or denies matters within his or her knowledge, no matter how improbable that explanation may appear.' [Citation.]" (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469.)

Our review of the record reveals no evidence in the prosecution's case, and within defendant's knowledge, that he did not explain or deny. He admitted being in the back seat of the Malibu at the fast food restaurant, but claimed to have left the vehicle

13

immediately before the shooting, and claimed Ford took his place in the back seat after retrieving something from the trunk of the car. After spending two or three hours with "Bear," defendant returned to Ford's motel room, where Ford was bragging about the shooting. The fact defendant's testimony was contradicted by that of Ford and by pre-trial statements and identifications made by the victims does not justify giving the instruction. (See *Saddler*, *supra*, 24 Cal.3d at pp. 682-683.)

Nevertheless, the Attorney General argues defendant failed to adequately explain a certain statement made in the letter he sent to Ford from jail, calling defendant's explanation "bizarre and implausible." In the letter to Ford, defendant stated that "he should have been mad at [Ford], but he wasn't," which Ford understood to refer to his statement to police implicating defendant as the shooter. The letter also stated: "I kept it solid with you on the street and in here." Ford understood this to refer to defendant having his back in the altercation with Paul. The letter further stated: "We are in this shit together, and we cannot let the [District Attorney] use the divide and conquer tactic on us." Ford understood this to be a warning against "snitchin[g]" because defendant "believed that [Ford] was the only thing that [the District Attorney] had against him." With respect to their prospects at trial, the letter stated: "I can't go into specifics, but it's looking positive." Finally, the letter asked Ford to send defendant money so that he could call his son and buy food at the commissary.

Defendant claimed during his direct testimony: "The purpose of the letter was letting [Ford] know that I kept it solid with you in here and out there. And I have every right to be mad at you. I got every right to be mad at you because you did this and I'm in here in jail, sitting down for it. But I said that we can't let the [District Attorney] divide and conquer us. I'm not going to tell [on you]. Just hold me down. Send me some money so I can talk to my son. Send me some money so I can eat . . . ." He continued: " 'I was reassuring him, I'm not going to snitch on you. Just hold me down while I'm in

14

jail.' " During cross-examination, the prosecutor asked defendant whether the letter contained any threats, which defendant denied. Defendant then stated he sent the letter through an intermediary to keep their communication "confidential." The prosecutor then asked: "What was it that was looking so positive about your case when you wrote that letter?" Defendant responded: "I'm basically letting him know just things are good. We just got to hold it down." The prosecutor repeated the question. Defendant answered: "Um, I don't know. I'm just reassuring him. I'm just talking to him right now. I'm trying to get him to send me some money." The prosecutor then asked for the "specifics" referred to in the letter. Defendant responded: "The specifics. Well, there's no evidence in the case. There's no -- there's no nothing. Basically it's just he say/she say."

While defendant's explanations for sending the letter to Ford, or for any of the statements made therein may not be believable, that is not the test. The test is whether an explanation was provided. Defendant provided an explanation for each sentence he wrote in the letter.

The Attorney General argues defendant's explanation "provided none of the 'specifics' that he hinted at in his letter" and therefore, "was no explanation at all." We disagree defendant was required to substantiate his statement with specifics in order to provide an explanation for making the statement. Indeed, defendant's initial response to the prosecutor's question was: "Um, I don't know. I'm just reassuring him." This answer suggests defendant had no specific reasons he thought the case looked positive, but said so in order to convince Ford to send him money. The Attorney General does not explain to us why such an "I lied to get money" explanation would not qualify as an explanation. But then, defendant did provide a reason he thought the case looked positive: "Basically it's just he say/she say." This too is an explanation. In the context of defendant's other statements and testimony, e.g., Ford was the shooter and defendant

15

would not testify against him, we interpret defendant's "he say/she say" statement to mean he believed the case would turn on whether the jury believed the testimony of the victims (assuming they were able to identify the shooter) or that of Ford and defendant denying any involvement. Again, while these explanations may not be believable, they are explanations. We conclude CALCRIM No. 361 was not supported by the record and was improperly given.

Turning to the question of prejudice, we conclude the error was harmless. In *Saddler*, *supra*, 24 Cal.3d 671, a robbery case, our Supreme Court held similar error in instructing the jury with CALCRIM No. 361's predecessor, CALJIC No. 2.62, was harmless despite the fact that "[t]here was clear conflict between [the victim's] identification of [the] defendant on the one hand and [the] defendant's alibi on the other," and "[t]here was little corroborating evidence other than that [the] defendant sometimes smoked the brand of cigarette which [the victim] said the robber left at the scene." (*Id*. at p. 683.) The court also acknowledged "the challenged instruction was not given in [a] previous trial which resulted in a hung jury." (*Id*. at p. 684.) Nevertheless, the court concluded the error was harmless because the victim's identification of the defendant "was positive," she had "ample time to observe and study her assailant" in a "well lighted" area and "was asked to view a total of 68 photos on 3 occasions, rejecting all until shown a photo of [the] defendant," the jury reached a verdict after one and a half hours of deliberation, and the jury was also instructed to "'disregard any instruction which applies to a state of facts which you determine does not exist.'" (*Id*. at pp. 683-684.)

Here, while there was a clear conflict between Ford's testimony and that of defendant, Ford's implication of defendant as the shooter was corroborated by the pre-trial statements made by both victims and by their subsequent identifications of defendant in separate photographic lineups. Thus, unlike *Saddler*, *supra*, 24 Cal.3d 671, where

16

there was little to corroborate the victim's identification of the defendant therein, here, there was corroboration of Ford's implication of defendant as the shooter. This is true despite the fact both victims recanted their prior identifications at trial. Indeed, this recantation testimony made their prior inconsistent statements identifying defendant admissible under Evidence Code section 1235 for the truth of the matters asserted, i.e., that defendant was the shooter. Nor were the victims' recantations believable. For our purposes, one example will suffice. As already mentioned, Nehemiah told a detective immediately after the shooting that he clearly saw defendant's face as the back window rolled down, just before the shooting started. He provided defendant's name. He also provided an accurate description. At trial, however, Nehemiah testified he did not see the shooter's face and did not remember telling the detective he had. And while he admitted telling the detective the shooter was a Black male, Nehemiah claimed he simply assumed as much because he was a Black male, he never had any problems with other races, and "every shooting that occurs in that area is a [B]lack male." The detective testified the latter statement was simply not true.

Our review of the record convinces us the jury likely believed the pre-trial identifications of defendant as the shooter and disbelieved the victims' recantation testimony. Indeed, both victims acknowledged during their testimony that being a "snitch" is not looked upon favorably "out there on the streets." Added to the victims' pre-trial corroboration of Ford's account of events is the letter defendant wrote to Ford from jail, which the jury could reasonably have found to be evidence of his consciousness of guilt. Moreover, like *Saddler*, the jury's deliberations were short-lived. While they filled one court day, as opposed to the hour and a half in *Saddler*, a portion of that day included viewing the surveillance video and hearing readback of testimony. Finally, the jury was also instructed that some of the instructions may not apply, which "may be

17

considered in assessing the prejudicial effect of an improper instruction." (*Saddler*, *supra*, 24 Cal.3d at p. 684.)

For the foregoing reasons, based on *Saddler*, we conclude the instructional error in this case was harmless.

## DISPOSITION

The judgment is affirmed.


      HOCH     , J.


We concur:


     BLEASE     , Acting P. J.


    NICHOLSON   , J.