Filed 7/7/14  P. v. Kebets CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C073377 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F04580) |
| v. | |
| ANDREY KEBETS, | |
| Defendant and Appellant. | |

A jury convicted defendant Andrey Kebets of negligently discharging a firearm, a felony.  (Pen. Code, § 246.3.)[1],[2]  Defendant contends the trial court erred prejudicially by

---

[1]    Undesignated section references are to the Penal Code.

[2]    Section 246.3 provides in pertinent part:  "Except as otherwise provided by law, any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense . . . ."

As will appear, defendant maintained he fired a blank round from his revolver in self-defense and defense of his family, aiming into the air, against an aggressive dog.  It

1

instructing the jury, over objection, with CALCRIM No. 371 (Consciousness of Guilt: Suppression and Fabrication of Evidence). We conclude the instruction was properly given. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

On July 2, 2012, Evangolos Litsas, his seven-year-old son, four-year-old daughter, and their 11-month old, 52-pound Coonhound puppy "Bo" returned to their apartment building from grocery shopping. Litsas parked in his assigned covered parking space in the building's lot. He handed Bo's leash to his daughter, along with the keys to the apartment. He and his son started to unload groceries from the trunk of the car.

Litsas saw a car back into a nearby space. Hearing someone yelling behind him, he turned and saw defendant, a neighbor in the apartment complex, stomping his feet at and chasing Bo. Litsas's daughter had apparently lost her hold on Bo and the leash.

At some point, defendant went back to the trunk of his car and returned with a "cylinder-style" handgun that looked like a .357 or a .38. Defendant screamed at Litsas, "Get control of your dog, or I will fucking kill it."

According to Litsas, Bo ran over toward him and his son. Defendant came within five feet of them, pointed the gun over Litsas's son's head, and fired. Litsas grabbed his son and Bo, went upstairs to his apartment, and called 911. The recorded call was played for the jury.

Litsas asked others in the complex where defendant and his family lived. As Litsas approached defendant's apartment, defendant came out and started yelling at Litsas. When defendant learned that Litsas was calling the sheriff, defendant demanded

---

was undisputed at trial that blanks are very unlikely to injure others even at close range. Thus, if accepted by the jury, this defense would have negated two elements of the offense: that the shooting could have resulted in injury or death to a person, and that it was not committed in self-defense or defense of another.

2

the phone to speak to the sheriff himself. Litsas did not hand defendant the phone. Defendant went to his car, opened the driver's door, and walked back toward the trunk.

Within 5 to 10 minutes, law enforcement vehicles arrived. An officer in a law enforcement helicopter ordered defendant to walk out to the middle of the parking lot and kneel. When Litsas gave a statement to the first responding officer soon afterward, he was visibly shaken.

Deaven Warren, a neighbor who was in the parking lot working on a car when Litsas's and defendant's cars arrived, saw Bo trot through the parking lot and stop where defendant's little girl was standing. Bo was not acting aggressive and did not appear dangerous to Warren, but the little girl looked uneasy. Warren saw defendant yell at Litsas, who yelled back. Defendant went to his car, returned with a silver revolver, and threatened to "put [the dog] down" if Litsas did not get it under control. Apparently assuaged by Litsas, defendant put the gun away. But then Bo wandered toward defendant's son. Angered again, defendant ran up behind Bo, pointed the gun in the air, and fired a shot over the head of Litsas's son.

Sacramento County Sheriff's Deputy Matthew Silvey detained defendant at the scene. Defendant told Silvey the gun was locked in the trunk of defendant's car. Silvey found a Smith & Wesson revolver in the trunk, with a cable lock through the cylinder. He also found an ammunition box holding seven live .357 Magnum bullets in the car's glove compartment. The investigating officers did not find any shell casings in the gun or anywhere in the vicinity.

Defendant told Deputy Silvey he had fired a blank, not a live round. But after the officers had searched the area, Silvey told defendant they had not located any of the spent blank he claimed to have fired.

When a revolver is fired, a shell casing or cartridge remains in the cylinder and must be removed by hand. This is true whether the shot fired is live ammunition or a

3

blank. However, a shell casing left by a blank cartridge looks very different from one left by a live round.

A blank, like a live round, makes a loud noise when fired and causes flame to flare out of the gun's muzzle. But firing a blank does not expend a projectile and is unlikely to injure anyone.

*Defense Case*

Defendant's wife, Svetlana, testified that in July 2012 their youngest daughter was four years old and smaller than average for her age. According to Svetlana, Litsas's dog ran toward the girl, getting very close to her face; when the girl raised her hand to protect herself, the dog started barking. Svetlana was yelling for the dog's owner while defendant started trying to block the dog's path. Defendant also began yelling at the dog's owner. The dog then ran toward Svetlana and growled at her.

Defendant raised his leg at the dog, which ran around the SUV parked next to defendant's car. The dog then reappeared and ran up to Svetlana. She saw that defendant had a silver bullet in his hand and was carrying a gun. As she ran past him to rejoin their children, she saw the dog running in their direction again. Defendant yelled a warning to the dog's owner, then fired his gun in the air to scare off the dog. According to Svetlana, defendant did not point the gun at anyone or threaten anyone. After firing it, he put it back in the trunk.

Defendant testified that he bought a .357 revolver in 2009 to use against bears when he went camping; he believed blanks were ideal for the purpose. On the day of the incident, he had the gun in his car trunk because he was planning a camping trip.

Defendant owned three kinds of ammunition: .357 rounds, .38 Special rounds, and blanks. He kept all three in the ammunition box in his glove compartment to economize on space. He could tell the live rounds from the blanks by their appearance.

When Litsas's dog ran toward defendant's daughter, he was afraid it would attack her. When the dog ran toward Svetlana, his whole family "freaked out." His attempt to

4

chase it away by sticking his leg out did not deter it. The dog kept running around and barking. He grabbed his gun from the trunk and unlocked it, then walked to the front of the car, opened his ammunition box, and retrieved several rounds, including one blank round. (However, he loaded only one round in the chamber, while holding the others in his left hand "just in case [he] need[ed] them.") In the meantime, the dog was still running around, out of control. Despite defendant's warning to Litsas that defendant would "put it down," Litsas was not attempted to get the dog under control.

Seeing the dog moving toward his family again, defendant raised his gun and fired a blank round into the air as a warning shot. Startled, the dog crouched down, then walked away. Defendant put the gun and ammunition back in the car, locking them appropriately, and walked to his apartment with his family.

Defendant acknowledged there should have been a shell casing in the revolver after he fired the blank, but he could not remember handling the casing. He was "thinking about other things" and "didn't think it would be important."

DISCUSSION

During the instructions conference, defense counsel objected to the giving of CALCRIM No. 371, which states in pertinent part: "If the defendant tried to hide evidence . . . , that conduct may show that (he/she) was aware of (his/her) guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."[3] Counsel argued there was no evidence to support the instruction because according to defendant's undisputed account he told the officers where his gun was and he simply did not remember what he had done with the shell casing in the gun's cylinder. The prosecutor replied the jury could reasonably infer defendant, knowing the officers were

---

[3]     Counsel also objected to CALCRIM No. 361 (Failure to Explain or Deny Adverse Testimony). Defendant does not renew that objection on appeal.

5

coming, deliberately removed and hid the casing. The trial court agreed. The court thereafter gave the challenged instruction.

Instructions on consciousness of guilt are properly given if supported by "some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference. [Citations.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102; *People v. Jackson* (1996) 13 Cal.4th 1164, 1222-1225; *People v. Johnson* (1992) 3 Cal.4th 1183, 1235-1236.) Furthermore, instructions such as CALCRIM No. 371, which "ma[k]e clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior," actually "benefit[] the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations.]" (*People v. Jackson, supra*, 13 Cal.4th at p. 1224.)

Here, the evidence showed: (1) after a revolver is fired, a shell casing remains in the cylinder unless manually removed; (2) there was no casing in the cylinder of defendant's revolver or anywhere else in the vicinity when the police found the revolver; and (3) there was no apparent opportunity for anyone else to gain access to the gun in defendant's locked trunk to remove the casing from the gun. Together, that evidence could reasonably give rise to the inference that defendant deliberately disposed of it to hide it from the police. As CALCRIM No. 371 correctly states, this inference would not suffice to prove defendant's guilt: the jury could still have concluded defendant fired a blank, or he acted in justifiable self-defense or defense of others, even if the jury also found he knowingly hid the casing and then testified falsely to a lapse of memory on that point.

It is frankly difficult to understand why defendant thinks the trial court erred by giving this instruction. As best we can determine, defendant asserts that because he

6

testified to an innocent "failure to recollect" what he had done with the casing, it was somehow unfair for the prosecutor to use CALCRIM No. 371 to support an attack on defendant's credibility. Not surprisingly, defendant fails to cite any authority to support this assertion, and we know of none.

Defendant also appears to assert the evidence we have outlined did not provide a basis for drawing a reasonable inference he hid evidence. According to defendant, "there [were] not even probabilities; there [were] mere possibilities, and it is impossible to tell which is more possible. This does not rise to the level of a permissible inference under state law. Any conclusion as to which inference to draw would be speculation, not rational inference." But defendant does not explain what "possibilities" could account for the absence of a shell casing in the cylinder of his revolver, other than his deliberately entering the locked trunk of his car to access his gun, removing the casing from his gun cylinder, and concealing it from the investigators after he learned Litsas called the sheriff. Thus, his point is unpersuasive.

Finally, defendant asserts the challenged instruction improperly shifted the burden of proof. But the only California decision defendant cites to support this assertion actually held it does *not* unconstitutionally shift the burden of proof to instruct the jury it may draw inferences adverse to the defendant from his failure to explain or deny evidence against him, and the instruction may therefore be properly given if supported by the record. (*People v. Saddler* (1979) 24 Cal.3d 671, 677-683 [former CALJIC No. 2.62].) Therefore, defendant's contention fails for want of apposite authority supporting it.

Because we conclude that CALCRIM No. 371 was properly given, we do not address defendant's claim that the instruction prejudiced him.

DISPOSITION

The judgment is affirmed.

7

                                    NICHOLSON          , Acting P. J.

We concur:


        BUTZ           , J.


        MURRAY         , J.