Filed 1/7/16  P. v. Harris CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>IRA BERNARD HARRIS,<br><br>    Defendant and Appellant. | A144857<br><br>(Contra Costa County<br>Super. Ct. No. 5-150039-6) |

A jury convicted Ira Bernard Harris of felony first- and second-degree residential burglary and of misdemeanor receiving stolen property.[1]  The trial court imposed a low-term sentence of two years in state prison for first-degree residential burglary, a 16-month sentence in state prison for second-degree residential burglary, which was stayed, and a concurrent sentence of six months in county jail for receiving stolen property.  Harris's appellate counsel has asked this court for an independent review of the record to determine whether there are any arguable issues.  (*People v. Wende* (1979) 25 Cal.3d 436.)  We have reviewed the record and have found no errors.  We therefore affirm.

## FACTS

On the afternoon of June 16, 2014, Vince Ruso was in the garage of his home on Minert Road in Contra Costa County.  The garage faces the street, and the garage door

---

[1]  The felony first- and second-degree residential burglary convictions were based on Penal Code sections 459 and 460, subdivision (a).  The receiving stolen property charge was based on Penal Code section 496, subdivision (a).  All further statutory references are to the Penal Code.

1

was open. Ruso heard someone honking a car horn at a slow-moving car ahead of it. The slow-moving car, a white, older model, four-door Mercedes sedan, then pulled over and parked across the street from Ruso's house. Two young men got out of the Mercedes, one of whom Ruso identified at trial as Harris. Ruso saw the men cross the street and walk up to the front door of the home of his next-door neighbor, Mary Tuchscherer. Ruso lost sight of the men when they entered the porch area. A short time later, Ruso realized that the two men were in Tuchscherer's back yard. He became suspicious, but he could not see clearly what they were doing because a fence blocked his view. He alerted his wife and asked her to call the police. Before the police arrived, Ruso and his wife saw Harris go back to the Mercedes, retrieve a small grey bag or pouch, and return to Tuchscherer's yard.

Two officers arrived on the scene while the men were still there. One of the officers, Daren Billington, reached over the tall gate at the side of Tuchscherer's house to undo the latch. As he did so, he saw Harris's accomplice, later identified as Tarell Smith, come around a corner at the rear of the house and walk toward the gate. Billington made eye contact with Smith, who abruptly stopped, turned around, and retreated. After Billington opened the gate, the officers entered the back yard, but no one was there. A shed in the garden contained two separate banks of file cabinets, which had been ransacked with drawers pulled open and papers strewn about. A black neoprene glove was found in the yard near the rear of the shed. A screen on a window at the back of the house had been cut in an L-shaped pattern along the frame. The cut had been made on the left side of the screen, running approximately 12 inches down the side of the screen and over six inches along the bottom of the screen. The smoothness of the cut on the screen showed the incision was made by a cutting tool. Police officers searched the property of the neighbor on the far side of Tuchscherer's property and found Harris hiding behind a tree in the back yard.

After Harris was apprehended, Billington located the white Mercedes with its engine still running. The vehicle appeared to be in working order, and Billington saw no smoke coming from under the hood. In a subsequent search of the Mercedes, police

found jewelry and electronics, including a pillowcase in the trunk containing jewelry, a Ziploc bag containing jewelry, two Amazon Kindles, a camera, Bose headphones, a De La Salle high school soccer ring, and another soccer ring with the name Dolan inscribed on it. There was also medical paperwork related to Tarell Smith in the car. Billington obtained a photograph from Smith's driver's license from the Department of Motor Vehicles records and immediately recognized Smith as the person Billington saw when he was trying to open the gate to Tuchscherer's back yard. Later, Billington searched Harris at the Concord jail and found a class ring for De La Salle high school in Harris's front right pants pocket.

Tuchscherer returned home on the day of the burglary to find police officers in front of her house. When police allowed her to go inside, Tuchscherer inspected the premises. She noticed that a screen in the living room window had been cut. She had left the window open a few inches when she left the house earlier that day, but she had locked the window in position so it could not be opened wider. The shed in the back yard had been ransacked, but no one appeared to have physically entered the home, and no property from inside the house was missing.

Several witnesses who lived in Contra Costa County testified that their homes had been burglarized within a month of the incident at Tuchscherer's home. All of them identified property recovered from Harris's vehicle as belonging to them. These witnesses included Patrick Dolan who testified that his four championship soccer rings, two from De La Salle high school and two from UC Berkeley, were stolen from his home and later returned to him by police. The UC Berkeley rings were inscribed with Dolan's name and shirt number.

Harris testified that in June 2014 he was homeless and living in his car (the white Mercedes). He kept all his belongings in the vehicle. His friend, Tarell Smith, was also homeless at the time, and Smith stayed in the Mercedes with Harris at least three nights per week and stored some of his property in the vehicle.

Harris testified about the events leading up to his arrest. He testified that he was driving the Mercedes slowly because it was overheating and smoke was coming from the

3

engine.  He pulled over on Minert Road after the driver behind him honked at him.  As he pulled over, Smith said that he knew the person who lived in the house across from where they were parked who could help with the car.  Smith said the person would leave the sliding glass door in the back open for him if the front door was locked.  After Smith and Harris knocked on the front door and no one answered, they went around back.  Smith tried to open the sliding glass door while Harris looked for a hose to get some water for the car.  Harris found a hose but it was not long enough to reach the car, so he went back to the Mercedes to look for a container that could hold water.  Finding none in the car, he returned to the back yard.  Smith then suggested they look in the garden shed for some coolant for the car.  Harris followed Smith into the shed, did not see anything that would be helpful, and came back out.  Harris made a few calls on his cell phone to try to get some help with the car; he talked with Jerome Monroe, a friend who lived in North Concord and whose next-door neighbor was a mechanic.  While Harris was on the phone he did not notice what Smith was doing; he did not see Smith cut the screen window and did not see Smith with any sharp implements that day.  At one point while Harris was on the phone, Smith ran toward him yelling, "Run."  Harris jumped over the side fence into a neighboring yard and hid.  Smith jumped over the back fence.

Harris testified that he ran because he was frightened by Smith's yelling and running, but he thought they had permission to be in Tuchscherer's back yard.  He assumed that Smith was running from somebody intent on harming him.  Harris did not realize Smith was running from the police until Harris was hiding under the tree and saw an officer with a police dog.  Harris testified that he had no idea Smith was trying to break into a stranger's home and did not know that some of the property Smith stored in the Mercedes was stolen.  Regarding the soccer rings in particular, Harris testified that he did not know that they were stolen.  He stated that he saw Smith wearing the rings on his fingers and asked if he could have one because he thought they were "cool."

DISCUSSION

During voir dire, the prosecutor exercised a peremptory challenge against Juror No. 1. Defense counsel then made a *Batson-Wheeler*[2] motion on the ground that Juror No. 1 "did not give answers to either of us that would lead to the exercise of a peremptory challenge for any reason other than the fact he's Hispanic." In response, the prosecutor explained that he had excused the juror because the juror was "very young," showed "poor judgment" by wearing a T-shirt with a woman in a bikini on it to court, and was the "last juror to arrive" that morning. The court found no prima facie case of group bias was established and denied the motion. We find no arguable issue on this point. (See *People v. Panah* (2005) 35 Cal.4th 395, 442 [defendant's *Batson-Wheeler* claim was "particularly weak as it consisted of little more than an assertion that a . . . prospective juror[] from a cognizable group had been excused"].)

Before closing argument, defense counsel asked the court to remove CALCRIM No. 361 from the jury instructions. CACRIM No. 361 instructs the jury on how to treat defendant's failure to explain or deny adverse testimony.[3] The trial court declined to remove the instruction because Harris had not explained how one of Dolan's rings came to be found in the Nissan car that Harris owned just before he bought the Mercedes. We find no arguable issue on this point because, regardless of the evidence about the ring, other evidence was presented that was either not explained or explained with a patently implausible account. (See *People v. Mask* (1986) 188 Cal.App.3d 450, 455 ["if the defendant tenders an explanation which, while superficially accounting for his activities, nevertheless seems bizarre or implausible, the inquiry whether he reasonably should have

---

2    *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258.

3    CALCRIM No. 361 as given states: "If [a] defendant failed in (his/her) testimony to explain or deny evidence against him or her, and if (he/she) could reasonably be expected to have done so based on what (he/she) knew, you may consider [the] failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

5

known about circumstances claimed to be outside his knowledge is a credibility question for resolution by the jury"].)  Consistent with the instruction, it was up to the jury to decide whether Harris failed to explain or deny evidence that he could reasonably have been expected to explain or deny, and it was up to the jury to decide whether an inference should be drawn from any such failure.  (See *People v. Saddler* (1979) 24 Cal.3d 671, 680 ["inferences are permissible only *if the jury* finds that defendant failed to explain or deny facts or evidence that he could be reasonably expected to explain or deny," original italics].)

The court properly instructed the jury on burglary under direct liability and aiding and abetting liability.  (See *People v. Alexander* (2010) 49 Cal.4th 846, 921 ["Because the evidence could support aiding and abetting liability, the trial court properly gave the aiding and abetting instructions"].)  Although no property was found missing from inside Tuchscherer's home, the court correctly instructed the jury that "a person enters a building if some part of his body, or some object under his control, penetrates the area inside the building's outer boundary.  A building's outer boundary includes the area inside a window screen."  (See *People v. Valencia* (2002) 28 Cal.4th 1, 14-15, disapproved on an unrelated point in *People v. Yarbrough* (2012) 54 Cal.4th 889, 894 [because "a window screen is part of the outer boundary of a building for purposes of burglary, it follows that the area behind the window screen is inside the premises.  Entry that is *just barely* inside the premises, even if the area penetrated is small, is sufficient," original italics].)

During closing argument, the prosecutor remarked that the defense "has the same subpoena power that the People have" and can "call in witnesses," yet did not call Jerome Monroe to testify that he took a phone call from Harris about a mechanical problem on the afternoon of the burglary.  Defense counsel objected that the prosecutor's comment was "[i]mproper argument."  The court overruled the objection and defense counsel asked to approach the bench.  An unreported sidebar was held at that point.  Later, out of the presence of the jury, defense counsel moved for a mistrial on the ground that the court had "interject[ed its] personal thoughts about the trial" because during the unreported

sidebar the court referred to counsel's objection as "baloney" in a voice loud enough to be heard by the jury. The court denied the motion for mistrial, stating, "I didn't say anything loud enough for the jury to hear. I want to make that absolutely clear. [¶] . . . [¶] The microphone was turned off, and I talked to you the same way every time up here." Moreover, the court observed that the challenged remarks were permissible argument on Harris's failure to sufficiently address adverse evidence. We find no arguable issues in these exchanges between defense counsel and the trial court. (See *People v. Bemore* (2000) 22 Cal.4th 809, 846 ["the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account"].)

In his sentencing memorandum, defense counsel requested the court to exercise its discretion and grant Harris a three-year term of probation and order completion of a drug treatment program as a condition of probation. At the sentencing hearing, the court noted that Harris was presumptively ineligible for probation because he was convicted of residential burglary. Penal Code, section 462 permits probation in such cases only "in unusual cases where the interests of justice would best be served." (§ 462, subd. (a).) The court concluded that this was not such a case, and probation was unwarranted under the factors set forth in California Rules of Court, rule 4.414(b)(2) because Harris was on probation when he committed the instant offense, showed no remorse, and "attempted to deceive the judicial system with lies." The trial court's denial of probation does not present an arguable issue. (See *People v. Martinez* (1985) 175 Cal.App.3d 881, 896 ["An order denying probation will not be reversed in the absence of a clear abuse of discretion. [Citation.] In reviewing the matter on appeal, a trial court is presumed to have acted to achieve legitimate sentencing objectives in the absence of a clear showing the sentencing decision was irrational or arbitrary. [Citations.]"]) Having denied probation, the court imposed the low term of two years in state prison for first degree residential burglary and imposed the fines required by law.

In sum, we have reviewed the entire record and find no meritorious issues to be argued on appeal.

## DISPOSITION

The judgment is affirmed.

 

                                                         _____

                                                         Humes, P.J.

We concur:


_____

Margulies, J.


_____

Dondero, J.


*People v. Harris* (A144857)