Filed 4/5/21  P. v. Deponte CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES MANUEL DEPONTE,<br><br>    Defendant and Appellant. | C083127; C089372<br><br>(Super. Ct. Nos. 15F6796;<br>CRF1500006796) |

A jury found defendant James Manuel Deponte guilty of multiple charges stemming from a domestic violence incident involving his girlfriend.  He was sentenced to an aggregate prison term of 13 years.  On appeal, he contends the trial court erroneously instructed the jury with CALCRIM No. 361, failure to explain or deny adverse testimony.  He also challenges the imposition of certain fines and fees in light of *People v. Dueñas* (2019) 30 Cal.App.5th 1157.

We affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution's Evidence

The victim testified she met defendant in late 2014 and began dating him exclusively the following year. In October 2015, on the night of the incident, she surprised defendant by visiting him while he was bartending at a local bar. She had a drink and decided not to stay, so defendant suggested she socialize with his boss.[1] The boss and the victim went to a bar across the street, where the victim drank more.

At 2:00 a.m., defendant arrived at that bar. He was "very angry, visibly drunk, stumbling, [and] screaming at people." He asked his boss, "What are you doing with my girlfriend?" The victim got up and left; defendant and the boss followed her to the parking lot, arguing. Defendant then screamed at the victim, calling her names. The boss told defendant he was fired.[2] The victim, knowing how defendant gets when drunk, and fearing it would "get worse," got in her car and drove off.

She drove only a short distance before realizing she couldn't safely drive and returned to the parking lot. Defendant was waiting by his SUV. He reached into the victim's car, yelled, "Get out bitch," grabbed her hand, and dragged her on the concrete to his SUV, abrading her back. He told her to get into his SUV and forced her into the passenger seat. He then got into the driver's seat, yelled at her, and hit her in the stomach. When she begged him to stop, he said, "Shut up, bitch."

Defendant drove toward the victim's house, driving 50 miles per hour in a 30 mile-per-hour zone and swerving frequently. While driving, defendant "constantly" punched the victim's face and stomach. The victim, in "extreme pain," asked defendant

---

[1] At the time of trial, defendant's boss and the victim were dating.

[2] The boss similarly testified that defendant arrived at the bar irritated, upset, and drunk and said: "What the fuck? You have been gone all night." Later, in the parking lot, defendant screamed at the victim.

to stop and tried unsuccessfully to defend herself.  Then, while the SUV was going 50 miles an hour, she opened the door, leapt out, and ended up face down in the roadway.

Defendant stopped the SUV, got out, and yelled, " 'Get out of the floor, bitch.' " He then kicked her twice in the stomach.  The victim got up and ran home; defendant drove next to her.  When she arrived, defendant was parked in her driveway, so she ran to a neighbor's house.  Police arrived soon thereafter.

A treating paramedic described the victim's injuries as multiple bleeding injuries to her scalp, a black eye, a deformed jaw, a swollen, face, and multiple abrasions to her torso.[3]  She appeared to be in extreme pain.  The victim also gave a statement about the incident to a responding officer.[4]

While paramedics were treating the victim, police stopped defendant near the victim's house.  He was "highly agitated" and appeared intoxicated.  He refused a breathalyzer or blood test, but his blood-alcohol level was eventually tested at 0.18 percent.  Defendant had blood on his hands, face, pants, and shirt.  Blood was also on his SUV's center console and front passer seat.  Defendant, screaming, repeatedly asked if the victim was okay.

While being transported to jail, he told police, "I didn't do this to her, dude."  He claimed the victim's ex-husband had attacked her and was "going to kill her."  He also

---

[3] The victim ultimately suffered a lacerated liver, a broken jaw, a broken nose, and 10 facial fractures.  She also had bruising around her eye and scrapes to her arm, elbow, back, head, hand, face, and neck.  She was eventually transferred by helicopter to a higher level of care hospital, where she stayed for a week.  To repair her jaw, she was put under general anesthesia to have her bones reset, her mouth was wired shut for nine weeks, two of her teeth were removed, and she had to wear braces for two and a half years.

[4] She told the officer she had had been in an argument with defendant at a bar.  When he drove her home, he started continuously punching her.  Fearing for her life, she jumped out of the moving SUV.

claimed he had found the victim by the side of the road and picked her up, getting her blood on him. Defendant said he was a "golden belt boxer," and claimed he kept the victim safe from her ex-husband. He added, "I turn my back for one minute. I'm at work and he fucking strikes."[5]

At trial, the boss testified that, at some point during the incident, he called the victim's cell phone. When the victim answered, the boss heard defendant making sounds like he was exerting himself, along with the victim screaming as if "she was scared to death." When the phone disconnected, the boss called back, and a few minutes later, defendant answered. The boss said, "What the fuck is going on?" Defendant said he couldn't find the victim. He added that police were at the victim's house, and her ex-husband must have "beat the shit out of her."

**Defense's Evidence**

Defendant testified that the night of the incident, he was bartending when the victim stopped by, and his boss came over to hang out. The three had a drink together, and defendant resumed bartending. At some point, his boss and the victim went to another bar.

When defendant had a break, he went to join them. When he arrived, his boss and the victim were alone at the bar. His boss was ordering the victim another drink, but defendant told him to stop because she looked intoxicated. His boss asked why he had left work and grew angry with him. The three went outside, and his boss began to argue with him — eventually firing him. Defendant tried to return to his bar, to retrieve his belongings, but the boss refused to let him in.

Defendant then saw the victim get into her car. He and the boss tried to dissuade her from driving. The boss eventually helped defendant retrieve some of his belongings

---

[5] A video of defendant's statement was played for the jury.

from the bar, and they returned to the parking lot. The victim pulled up next to them in her car, refused defendant's offer of a ride home, and drove off. Defendant sat in his SUV and smoked a cigarette.

The victim soon returned, parking next to defendant, and the two began to talk. She agreed to let him drive her home, and he took the back roads because he did not have a driver's license. Defendant testified that he felt comfortable driving because he had had only four ounces of alcohol over the course of four and a half hours. But he conceded, he knew he should not have been driving.

As he drove, he got into an argument with the victim. Defendant claimed the argument escalated when the victim said she "couldn't wait to call it a day and get in bed and cuddle," but defendant refused, saying he was going home. When defendant saw headlights behind him, he feared it was the police and sped up. When defendant turned on to the victim's street, she started hitting him. He denied hitting the victim. He testified he pushed her against the door to prevent her from hitting him and said he'd let her go if she stopped hitting him. She said okay, but when he let go, she opened the door and jumped out. He stopped and ran to check on her. He found her with her head on the sidewalk and her body on the asphalt.

She said she was "fine" and did not appear injured, so he helped her into the SUV. They both cried and apologized. Defendant again saw headlights and panicked, fearing the police would arrest him because he had no license, no required interlock device, and "was drunk." The victim also feared she would lose her job. She hit defendant two more times, exited the SUV, and ran away. A car pulled up next to him and the people inside asked defendant if everything was okay. Defendant said the victim was drunk, and "I give up," and drove home.

Defendant testified that, when he arrived home, he began to drink vodka in his SUV. The victim's phone, which was on the passenger seat, rang. It was the boss. Defendant told the boss the victim was drunk, had hit him, and jumped out of his SUV.

5

As defendant spoke, he realized the victim's keys were still in his SUV, so he drove back to the victim's house. When he arrived, he saw police and an ambulance. He was arrested.

When an officer told him he was under arrest for domestic violence, defendant was upset because the officer refused to tell him the victim's condition. He testified that he "talk[ed] a lot of crap" to the officer. And during cross-examination, he denied saying the victim's ex-husband had injured her.

### Verdicts and Sentencing

The jury found defendant guilty of inflicting corporal injury (Pen. Code, § 273.5, subd. (a))[6], battery with serious bodily injury (§ 243), assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)), kidnapping (§ 207, subd. (a)), false imprisonment by violence (§§ 236, 237), driving under the influence (Veh. Code, § 23152, subd. (a)), driving with a blood-alcohol level of 0.08 percent or higher (Veh. Code, § 23152, subd. (b)), unlawfully operating a motor vehicle (Veh. Code, § 23247; count 8), and driving on a suspended license (Veh. Code, § 14601.2, subd. (a)).

The jury also found, as to counts 1, 3, 4, and 5, that defendant personally inflicted great bodily injury under circumstances involving domestic violence. (§ 12022.7, subd. (e).) As to counts 6 and 7, it found defendant had refused a chemical test, had a 0.15 percent or higher blood-alcohol level, and committed a prior DUI related offense. (Veh. Code, §§ 23577, 23578, 23582.) As to count 1, the parties stipulated defendant was previously convicted of inflicting corporal injury. (§ 273.5, subd. (f).) And the trial court found defendant had suffered a prior DUI related conviction. (Veh. Code, § 23540.)

The trial court sentenced defendant to an aggregate term of 13 years, comprised of eight years for kidnapping plus five years for the great bodily injury enhancement. It also

---

[6] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

6

imposed concurrent 180-day terms for unlawfully operative a motor vehicle and for driving on a suspended license.  Various terms were imposed on the other counts, and stayed pursuant to section 654.

## DISCUSSION

## I.  Instruction Error

On appeal, defendant contends the trial court erred in instructing the jury with CALCRIM No. 361, regarding the failure to explain or deny adverse testimony. Defendant maintains he never failed to explain or deny evidence that he could reasonably have been expected to deny or explain, and his testimony had no significant omissions concerning Evidence Code section 1109 testimony.  We agree but find the error harmless.

### A.  Additional Background

At trial, the prosecution offered, under Evidence Code section 1109, evidence of defendant's other domestic violence acts.  The evidence was presented through testimony of two former girlfriends of defendant.

### 1.  The First Former Girlfriend

The first former girlfriend testified she had had a two-year "on and off" relationship with defendant beginning in 2007, and they had a son together.  In early 2009, when they were separated, defendant yelled at her, threatened to kill her, and "socked" her face.  That evening, defendant called and threatened to kill her and her brother.

Six months later, defendant came to her house.  He demanded to be let in to see his son.  When she refused, he threw chairs and banged the door and window.  She hid in a bedroom closet and called the police.  While hiding, she heard defendant threaten to kill her brother.  Defendant broke down her door and came inside, but he eventually left. When he was arrested, he appeared intoxicated.

On cross-examination, defense counsel asked the former girlfriend about arrests in 2007 and 2008 for battery against defendant.  She denied any memory of them but

7

conceded that in 2007 she and defendant had been going to court over custody of their son. And in 2009, the son had been removed from her custody; defendant ended up with primary custody. She currently has custody, but in 2014 the court ordered shared custody.

### 2. The Second Former Girlfriend

The second former girlfriend testified she started dating defendant in early 2009. Four months later, she got into an argument with an acquaintance at a local bar and ended up punching the acquaintance. The second former girlfriend went home, and defendant showed up. He was "very agitated" and angry with her because the acquaintance was going to be a witness for him in a child custody matter.

Defendant asked the second former girlfriend to apologize, but she refused. That angered defendant. Defendant "full force shoved" her down onto her front steps. When she tried to get up, he shoved her down "even harder." She fell on the step again and hit her head on the wall. Defendant grabbed a piece of carpet, threw it over her, and started hitting her. The attack ended when the front door was opened by her daughter, and the second former girlfriend fell over the threshold. Defendant ran away, and the police were called.

The parties stipulated that defendant was convicted of corporal injury to the second former girlfriend.

### 3. Defendant's Testimony about the Evidence Code section 1109 Evidence

When he testified, defendant claimed his relationship with the first former girlfriend was "[t]oxic, [and] dangerous" due to drugs and alcohol. He added that, as to the drugs and alcohol, "in the beginning it was both of us. At the end it was primarily [her]."

As to the second former girlfriend, he testified their relationship was "great until the end," when she "picked a fight with a really good friend of mine . . . ending in an altercation [outside a bar]." According to defendant, the acquaintance had told him the

8

second former girlfriend was lying to him. Asked why he entered a plea, defendant explained: "Because my son was taken from his mother and placed in Children and Family Services and I was given six months for reunification . . . ." He added, "I couldn't risk losing my son forever . . . and if I had lost the . . . case with [the second former girlfriend], I would have lost my son. So I took the plea with the district attorney for six months so that I can begin reunification with Children and Family Services." The plea allowed him to receive probation and avoid incarceration. During probation, he took and completed classes, including "The Batterer's Program." It taught him to recognize and address anger as well as to avoid toxic relationships.

On cross-examination, he admitted going to the second former girlfriend's house after her fight with the acquaintance. He also admitted telling an officer he had been drinking heavily, had passed out, and he should not have gone to her house.

### 4. Jury Instruction Conference

The prosecutor asked the trial court to instruct the jury with CALCRIM No. 361, which provides: "If the defendant failed in his testimony to explain or deny evidence against him and if he could reasonably be expected to have done so based upon what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

The trial court noted the instruction involves the failure to explain or deny, and as to defendant's testimony, "we have a different version of what happened [—] that's different from a failure to explain or deny evidence against him."

The prosecutor responded that the instruction was appropriate, noting, "there are portions of [defendant's] statement that did not explain or deny certain crimes and some of the 1109 prior evidence." She added that defendant "didn't really offer any testimony regarding the incidents that [the first former girlfriend] testified about" and "[h]e did not

9

address really what happened between he and [the second former girlfriend] that resulted in her injuries."

Defense counsel agreed that defendant did not explain or deny the allegations of abuse concerning the first and second former girlfriend but argued it was inappropriate to give the instruction solely based on the prior domestic violence evidence because the instruction does not distinguish between testimony pertaining to the charged offenses and testimony pertaining to the Evidence Code section 1109 evidence.

The trial court agreed to give the instruction, explaining that as to the first victim, "he talked about the nature of their relationship. He didn't say anything about the evidence of domestic violence. So arguably there is a failure to explain or deny that evidence." As to the DUI, "He did not deny the driving under the influence, so that is a failure to deny."[7]

The court thereafter instructed the jury with CALCRIM No. 361. During closing arguments, the prosecutor made no mention of that instruction, though in referenced to the second former girlfriend's testimony and defendant's subsequent conviction, she told the jury, "[h]e didn't admit that he did anything wrong but he didn't exactly deny it either."

### B. Analysis

On appeal, defendant argues he did not fail to explain or deny evidence that he could reasonably have been expected to deny or explain, and his testimony had no significant omissions concerning the Evidence Code section 1109 testimony. And while his testimony differed from the prosecution's evidence, a contradiction is not a failure to explain or deny.

---

[7] Defense counsel replied that defendant had admitted the DUI charges and thus it could not constitute a failure to deny.

10

The People respond that the instruction was proper because defendant failed to explain or deny allegations of domestic violence involving the former girlfriends, noting as to the first former girlfriend, defendant said only that their relationship was toxic and dangerous. As to the second, he said only that the relationship was great until the end and that he plead in order to seek reunification with his son.[8]

We agree with defendant that the instruction was unwarranted. Nevertheless, the error was harmless.

CALCRIM No. 361 may be given "only when a defendant *completely* fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (*People v. Cortez* (2016) 63 Cal.4th 101, 117, italics added.) Mere contradictions between a defendant's testimony and other witnesses' do not suffice. (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469.) Nor is it enough that the defendant's testimony is not believable — no matter how "improbable, incredible, unbelievable, or bizarre" the explanation may be. (*Cortez,* at p. 117.)[9]

However, such instruction has been held proper in instances where a defendant's testimony (1) denied committing three charged rapes but failed to mention uncharged offenses that had been ruled relevant to common scheme or plan; (2) presented an alibi as to only two of four charged robberies; and (3) denied committing one charged rape but

---

[8] The People take no position on whether defendant's testimony as to the misdemeanor vehicle code charges would obligate the instruction. As to those, we simply note that defendant testified that he knew he should not drive, but still felt comfortable driving because he had had only four ounces of alcohol. He also testified the bulk of his drinking was done after he stopped driving.

[9] *Lamer* addressed CALJIC No. 2.62. "CALCRIM No. 361 is similar in content to CALJIC No. 2.62." (*People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1066.)

failed to testify regarding two uncharged sexual assaults. (*People v. Saddler* (1979) 24 Cal.3d 671, 681 [discussing CALJIC No. 2.62].)

In reviewing a challenge to a CALCRIM No. 361 instruction, our task is " 'to ascertain if the defendant failed to explain or deny any fact of evidence that was within the scope of relevant cross-examination" and was "within the defendant's knowledge which he . . . did not explain or deny.' " (*People v. Grandberry* (2019) 35 Cal.App.5th 599.)

Here, it cannot be said that defendant completely failed to explain or deny the evidence of the uncharged domestic violence. As to the first former girlfriend, defendant explained that the relationship was "[t]oxic, [and] dangerous" due to drugs and alcohol and suggested that the former girlfriend bore most of the responsibility for it: "in the beginning it was both of us. At the end it was primarily [her]." That testimony dovetailed with defense counsel's cross-examination of the first former girlfriend, which implied that the fighting and her testimony was motivated by a custody dispute. Whether defendant's explanation (essentially admitting the allegation, but casting blame on the victim) could be considered believable or complete is beside the point. He was not silent and therefore it did not warrant the instruction.

Similarly, as to the second former girlfriend, defendant testified that he pled to the offense to avoid incarceration because he couldn't risk losing his son — essentially admitting the incident but implying mitigating circumstances existed. He suggested it was the victim's fault, noting that she started it by picking a fight with a good friend of his, and implying their toxic relationship was the cause, noting the batterers' class taught him to "stay away from toxic relationships . . . ." Again, this explanation may be neither credible nor complete, but it did not constitute a complete failure to explain *or* deny.

Accordingly, instructing with CALCRIM No. 361 was error. That error, however, was harmless.

Defendant submits the error must be reviewed under the *Chapman*[10] standard. Courts, however, have applied the more deferential *Watson*[11] standard when evaluating error for an erroneous instruction with CALJIC No. 2.62, CALCRIM No. 361's predecessor. (See e.g., *People v. Saddler, supra*, 24 Cal.3d at p. 683; *People v. Lamer, supra*, 110 Cal.App.4th at p. 1471.) Regardless, the error here was harmless under either standard.

Overwhelming evidence supported the finding of guilt. The victim's testimony implicating defendant was corroborated in multiple respects. Immediately after the incident, she told a responding officer defendant had attacked her. Her description of the attack then was consistent with her later trial testimony. Blood was found inside defendant's SUV. This was consistent with the victim's testimony that defendant had punched her repeatedly. The boss's testimony also corroborated the victim's — describing defendant as belligerent at the bar, and recalling the victim scream over the phone as if "she was scared to death," while defendant claimed he couldn't find her.

By comparison, defendant's testimony defied credulity on its face and was contradicted at several points. His attempt at trial to foist blame on the victim was contradicted by his own statements to officers and to his boss, blaming the ex-husband. His testimony that the victim said she was fine and did not appear injured after she jumped from the car was contradicted by a paramedic's testimony describing the victim's grievous injuries. And defendant's claim that he never punched the victim was contradicted by the blood found in his SUV.

Moreover, the instruction largely inured to defendant's benefit. Though we agree with defendant that, as a matter of law, the instruction was unwarranted, if a juror

---

10 *Chapman v. California* (1967) 386 U.S. 18.

11 *People v. Watson* (1956) 46 Cal.2d 818.

13

nevertheless concluded that defendant had failed to adequately explain or deny the uncharged acts of domestic violence, the instruction would have simply admonished the juror that such a failure cannot alone establish guilt, and that the People must still prove the elements of the offense. (See *People v. Rodriguez*, *supra*, 170 Cal.App.4th at p. 1067.)

In sum, the error was harmless under any standard of prejudice.

## II.  Imposition of Fines and Fees

Defendant also contends remand is required to allow the trial court to conduct an ability to pay hearing. We disagree.

## A.  Additional Background

At sentencing, the trial court imposed fines and fees including a $10,000 restitution fine (§ 1202.4, subd. (b)), a $360 court operations assessment (§ 1455.8, subd. (a)(1)) and a $270 conviction assessment (Gov. Code, § 70373). The probation report had recommended fines and fees in that amount. Defendant raised no objection to them.

While this appeal was pending, defendant, in pro per, filed an ex-parte motion with the trial court to stay his fines and fees in light of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). He wrote that he was indigent when sentenced and remains indigent while incarcerated, and the fines and fees present a "financial impossibly" and an undue burden.

The trial court denied the motion, concluding that defendant forfeited any challenge to the imposition of fines and fees by failing to object at sentencing. The court noted that, "[a]s the sentencing court was aware of Defendant's future in state prison, the sentencing court was aware of Defendant's ability to pay the fine."

Defendant appealed from that order. We consolidated that appeal with his original appeal.

## B. Analysis

On appeal, defendant argues the imposition of the $10,000 restitution fine, the $360 operations assessment, and the $270 conviction assessment was unconstitutional. In support, he cites *Dueñas, supra,* 30 Cal.App.5th at pages 1168, 1172, which held that due process requires the trial court to stay execution of restitution fines, as well as court operation and conviction assessments, until it has held a hearing and determined the defendant has the present ability to pay.

The People respond that defendant has forfeited the challenge for failure to raise the claim at sentencing.[12] We agree with the People.

While defendant's sentencing predated *Dueñas* by several years, he still had cause to raise an ability to pay challenge at sentencing. Under section 1202.4, in effect at the time of sentencing, the trial court could consider a defendant's ability to pay when imposing more than the minimum fine. (See § 1202.4, subd. (c) ["Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine"].) And prior to sentencing, the probation report had recommended imposing the maximum restitution fine of $10,000. Yet defendant did not contest his ability to pay in the trial court.

Courts have held that where a defendant is sentenced pre-*Dueñas*, and fails to raise an ability to pay change when the trial court imposes more than the minimum restitution fine, that forfeits a future ability to pay challenge as to the restitution fine as well as to the operation and conviction assessments. (See *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 ["Given his failure to object to a $10,000 restitution fine based on inability to

---

[12] The People note that the trial court lacked jurisdiction to consider defendant's *Dueñas* challenge while this appeal was pending. Nevertheless, the People ask that we construe the brief filed in the subsequent appeal as a supplemental brief, in lieu of dismissing the second appeal. We will do so.

pay, Frandsen has not shown a basis to vacate assessments totaling $120 for inability to pay"]; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 ["As a practical matter, if Gutierrez chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees"].)

We similarly conclude that because defendant failed to raise an ability to pay challenge when the trial court imposed the maximum restitution fine of $10,000, he has forfeited his ability to pay challenge in light of *Dueñas*.

Moreover, even if defendant had not forfeited his *Dueñas* claim, we would reject it on the merits, joining the courts that have concluded *Dueñas* was wrongly decided. Defendant was not entitled to an ability to pay hearing. (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055; *People v. Caceres* (2019) 39 Cal.App.5th 917, 923-929.)

## DISPOSITION

The judgment is affirmed.


                                                    /s/
                                              MURRAY, J.


We concur:


      /s/
BLEASE, Acting P. J.


      /s/
HULL, J.

16